# EXHIBIT A

VAN DER HOUT
Immigration & Nationality Law

CENTER FOR CONSTITUTIONAL RIGHTS

May 8, 2026

**Executive Office for Immigration Review**
Office of the General Counsel
Attn: FOIA Service Center
5107 Leesburg Pike, Suite 2150
Falls Church, VA 22041
Online Request Form

**U.S. Department of Justice**
FOIA/PA Mail Referral Unit
Department of Justice
Room 115
LOC Building
Washington, DC 20530-0001
Email: MRUFOIA.Requests@usdoj.gov

Kilian B. Kagle, Chief
Civil Division
4CON, Room 6.153
950 Pennsylvania Ave., N.W.
Washington, DC 20530
Phone: (202) 514-4210
Email: CRT.FOIArequests@usdoj.gov

Christina Butler
Chief, FOIA/PA Unit
Criminal Division
Department of Justice
950 Constitution Ave., NW
Washington, DC 20530-0001
Phone: (202) 616-0307
Email: crm.foia@usdoj.gov

Arnetta Mallory
Government Information Specialist
National Security Division
Department of Justice
3 Constitution Square
175 N Street N.E., 12th Floor
Washington, DC 20530-0001
Phone: (202) 233-2639
Email: nsdfoia@usdoj.gov

Melissa Golden
Lead Paralegal and FOIA Specialist
Department of Justice
Room 5517, 950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001
Phone: (202) 514-2053
Email: usdoj-officeoflegalcounsel@usdoj.gov

Arla Witte-Simpson
FOIA Public Liaison
Executive Office for United States Attorneys
Department of Justice
175 N Street, N.E.
Suite 5.400
Washington, DC 20530-0001
Phone: (202) 252-6036
Online Request Form

Andrew Fiorillo
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
6th Floor
441 G St NW
Washington, DC 20530
Phone: (202) 514-FOIA
Online Request Form

SENT BY EMAIL AND ONLINE AGENCY FORMS

**Re: Freedom of Information Act Request**

To the Freedom of Information Officer:

This is a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the Privacy Act, 5 U.S.C. § 552a, by the Center for Constitutional Rights ("CCR") and Van Der Hout LLP on behalf of **Mahmoud Khalil** (the "Requestors") to the U.S. Department of Justice ("DOJ") and its constituent agencies for information relating to undue influence and interference with the processing and adjudication of Mr. Khalil's removal proceedings. We ask that this Request be directed to all applicable parts of the DOJ, including but not limited to subcomponents within the Executive Office for Immigration Review ("EOIR"), the Board of Immigration Appeals ("BIA"), the Office of the Chief Immigration Judge ("OCIJ"), and its component immigration courts and personnel, and the U.S. Attorney's Offices for the Southern District of New York, District of New Jersey, and Louisiana.

## I. <u>Purpose of this Request</u>

As explained in greater detail below, immigration judges are required by law to exercise their independent and impartial judgment in adjudicating removal proceedings.[1] Noncitizens in removal proceedings have the right to a full and fair adjudication of their defenses to removability and applications for relief from removal in immigration court and before the BIA.[2] In short, no other entity outside of or within the DOJ should be secretly advising, reviewing, revising, or otherwise influencing the decision-making of an immigration judge in an individual case in order to achieve a preferred or predetermined outcome. Similarly, no one who has had a hand in the investigation or prosecution of the removal charges against Mr. Khalil should have a role in adjudicating his legal claims.

The purpose of this request is to determine whether, based on the DOJ's own records, anyone other than the immigration judge who adjudicated Mr. Khalil's case, played a role in shaping the adjudication of his case, and what the content and scope of such influence and interference has been. Specifically, the Requestors seek records that would expose any influence by government officials or others—including but not limited to officials within the Office of the Attorney General, the DOJ Civil Division, and the BIA, as well as individuals outside of DOJ—on the decisions of the Immigration Judge who oversaw Mr. Khalil's removal proceedings before the LaSalle Immigration Court in Jena, Louisiana—former Acting Chief Immigration Judge ("ACIJ") Jamee E. Comans.[3] Mr. Khalil expects these communications will demonstrate that multiple DOJ officials, including current members of the BIA, were directly involved in the decision-making and/or drafting of oral and written decisions issued by IJ Comans in the course of Mr. Khalil's removal proceedings. This undue influence and interference directly violates the

---

[1] *See* 8 C.F.R. § 1003.10(b) ("In deciding the individual cases before them, and subject to the applicable governing standards set forth in paragraph (d) of this section, immigration judges *shall* exercise their independent judgment and discretion[.]…In all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations.") (emphasis added); 8 C.F.R. § 1003.9(c) ("The Chief Immigration Judge shall have no authority to direct the result of an adjudication assigned to another immigration judge[.]").

[2] *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."); *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 617 (1993) ("due process requires a 'neutral and detached judge *in the first instance*.'") (emphasis added) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972); *id.* at 618 ("Even appeal and a trial *de novo* will not cure a failure to provide a neutral and detached adjudicator."); *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) (neutral judge is one of the most basic due process protections); *Wang v. Att'y Gen.*, 423 F.3d 260, 267–68 (3d Cir. 2005) (noting the duty of IJs to remain neutral and impartial when they conduct immigration hearings); *Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954) ("the Board must . . . exercise its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right.").

[3] Shortly after issuing the removal order in Mr. Khalil's case in September 2025, IJ Comans was promoted to be Assistant Director of the Office of Policy for EOIR in December 2025. *See* EOIR, *Staff Profile: Office of Policy, Assistant Director*, available at https://www.justice.gov/eoir/staff-profile/office-policy-acting-assistant-director. In contrast, EOIR leadership fired two other immigration judges who issued decisions in in favor of noncitizens who, like Mr. Khalil, were targeted on the basis of protected speech in support of Palestinian rights and whose cases received significant public scrutiny. *See* "Judges Fired After Blocking Deportations of Pro-Palestinian Students," *NY Times* (Apr. 11, 2026), https://www.nytimes.com/2026/04/11/us/politics/immigration-judges-deportations-students.html.

IJ's clear regulatory duty to decide cases independently and impartially, and Mr. Khalil's due process, statutory, and regulatory rights to a neutral and independent judge.

## II. Background

Mahmoud Khalil is a thirty-one-year-old Palestinian who is married to a U.S. citizen, with whom he shares a one-year-old U.S. citizen son. Mr. Khalil applied for and received lawful permanent residency in 2024 based on his marriage to his U.S. citizen wife. Despite Mr. Khalil having no criminal history anywhere in the world, on March 8, 2025, ICE officers arrested and detained him, then transferred him from New York to a remote immigration jail in Jena, Louisiana, where he remained detained for 104 days until a federal judge ordered his release. Mr. Khalil is one of a number of individuals who have been targeted by a government policy to retaliate – through immigration detention and deportation – against students and scholars protesting Israel's ongoing genocide in Gaza and U.S. complicity in that. Evidence later revealed that high-level officials in the White House, the U.S. Department of State, the U.S. Department of Justice, and the U.S. Department of Homeland Security, were involved in the investigation, targeting, and decision making to pursue the detention and removal of Mr. Khalil.[4]

Following his detention, Mr. Khalil was placed in removal proceedings at the LaSalle Immigration Court in Jena, Louisiana, where his case was assigned to ACIJ Jamee E. Comans. On information and belief, when Mr. Khalil arrived at the Central Louisiana ICE Processing Center ("CLIPC") where he was detained, he was the sole case on IJ Comans's docket at the LaSalle Immigration Court. In his removal proceedings, the U.S. Department of Homeland Security ("DHS") asserted that Mr. Khalil is removable because of a determination by Secretary of State Marco Rubio that he has "reasonable grounds to believe that Khalil's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States," purporting that the Determination satisfied 8 U.S.C. § 1227(a)(4)(C) (hereinafter referred to as the "foreign policy ground"). After Mr. Khalil filed a lawsuit in federal court challenging that determination, DHS added a second charge ("the post-hoc charge") asserting that Mr. Khalil had misrepresented material information on his application for lawful permanent resident status, *see* 8 U.S.C. § 1227(a)(1)(A), a charge which he also contested.

Throughout the course of Mr. Khalil's removal proceedings, IJ Comans issued several oral and written decisions regarding removability and relief. The speed and nature of several of these decisions were extremely unusual.

On April 11, 2025, approximately forty-eight hours after DHS filed the determination by Secretary Rubio in immigration court, the IJ orally delivered what appeared to be a pre-written decision finding Mr. Khalil removable as a result of the

[4] *See, e.g.*, *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 138-146 (D. Mass. 2025), *judgment entered*, No. CV 25-10685-WGY, 2026 WL 524753 (D. Mass. Jan. 22, 2026); *Khalil v. Joyce*, Case No. 2:25-cv-01963-MEF, Dkt. 382 (Fourth Amended Complaint) ¶¶ 42-55.
.

determination. Mr. Khalil subsequently submitted applications for relief from removal in immigration court.

On May 22, 2025, Mr. Khalil appeared at his Individual Calendar Hearing before IJ Comans. At that hearing, the IJ denied DHS's motion to pretermit Mr. Khalil's relief application, in which DHS asserted he is a threat to national security on the basis of the Rubio Determination. The IJ found on May 22 that Mr. Khalil was not statutorily barred from asylum, and denied his request for a continuance to gather evidence as to why the bar did not apply. The manner in which the IJ conducted the May 22 hearing was once again highly unusual. Although Mr. Khalil's hearing was scheduled on the EOIR Courts & Appeals System (ECAS) to last only two hours, the IJ insisted that the hearing would be finished that day. After counsel for Mr. Khalil informed the IJ that they had a client meeting with Mr. Khalil that had been ordered by the District Court that afternoon, the IJ refused to recognize the court-ordered meeting and told counsel for Mr. Khalil, "I'm finishing this case today." The IJ proceeded to conduct a full-day hearing, which is extremely unusual in immigration proceedings.

On June 11, 2025, Judge Michael Farbiarz issued a preliminary injunction in *Khalil v. Trump*, Case No. 2:25-cv-01963-MEF, Dkt. 299, *as clarified by* Dkt. 355 (D.N.J.),[5] barring DHS and EOIR from seeking to detain or remove Mr. Khalil based on the Rubio Determination. Nevertheless, on June 20, the IJ issued a written decision (1) memorializing her April 11 oral finding of removability on the foreign policy ground charge; (2) finding Mr. Khalil removable under the post hoc charge that he misrepresented information on his adjustment of status application; and (3) denying Mr. Khalil asylum, withholding of removal, and protection under the Convention Against Torture. The IJ did not address Mr. Khalil's request for a waiver of the alleged misrepresentation charge. The IJ also issued an order denying Mr. Khalil a bond hearing on the basis of the enjoined Rubio Determination. Mr. Khalil submitted a motion to reconsider the IJ's June 20 written decision on removability and relief, as it directly violated the District Court's injunction, but the IJ denied this motion without analysis on July 3.

On July 17, the District Court clarified the terms of its June 11 injunction. The IJ then reopened proceedings on July 18 for the purpose of considering Mr. Khalil's waiver request. In light of the District Court's clarification, the IJ issued an order on July 31 vacating her finding of removability under the foreign policy ground. This July 31 decision also contained a highly unusual footnote criticizing the federal District Court order.

---

[5] On January 15, 2026, the U.S. Court of Appeals for the Third Circuit overruled the district court's order in a split panel decision on jurisdictional grounds. *Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026). On March 31, 2026, Mr. Khalil filed a petition for rehearing en banc, which remains pending before the Third Circuit. *Khalil v. Trump*, Case No. 25-2162, Dkt. 138 (3d Cir. Mar. 31, 2026). Accordingly, the mandate for the Third Circuit has not issued and the district court's orders remain in effect. *See, e.g.*, Fed. R. App. P. 41(b) ("The court's mandate must issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later."); Fed. R. App. P. 41(c) ("[t]he mandate is effective when issued"); *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 97 (3d Cir. 1988) ("[a]n appellate court's decision is not final until its mandate issues.").

Then, on September 12, the IJ issued an amended decision denying Mr. Khalil's waiver request, without holding a hearing, and again ordering him removed. Notably, in that decision, the IJ declined to follow binding BIA caselaw holding that Mr. Khalil was eligible for the waiver he sought, instead writing a decision suggesting that particular BIA precedent should be overruled. This is highly unusual, given that IJs are bound by regulation to follow BIA precedent.[6] On February 26, 2026—four days before Mr. Khalil's opening brief on appeal was due—the BIA issued a published decision in another matter overruling its prior precedent on eligibility for the waiver and adopting the reasoning in IJ Comans' decision. *See Matter of Forjoe*, 29 I&N Dec. 463 (BIA 2026).

Mr. Khalil appealed the IJ's decisions to the BIA, which addressed his appeal on an extraordinarily expedited schedule for a non-detained case. [7] The BIA first issued a briefing schedule on October 22, 2025, eight business days after Mr. Khalil filed his appeal. The speed in which this briefing schedule was issued was extraordinarily fast, particularly for a non-detained case like Mr. Khalil's.[8] Mr. Khalil subsequently jointly agreed with the federal respondents in his habeas proceedings to stay both BIA proceedings and discovery before the district court until the Third Circuit panel issued its decision, and agreed that Mr. Khalil's opening brief at the BIA be submitted forty-five days after the panel decision.

Only several hours after the Third Circuit's January 15 panel decision, the BIA issued a notice stating that a briefing schedule would be set "forthwith."[9] Shortly thereafter, Mr. Khalil filed a notice requesting that the BIA defer setting a briefing schedule until January 20 to allow the parties an opportunity to meet and confer. On January 16, the BIA issued two briefing schedules, without acknowledging Mr. Khalil's notice. The first ordered sequential briefing, allotting twenty-one days for Mr. Khalil's opening brief and twenty-one days for the government's opposition. Later that day, the BIA issued a second revised schedule requiring simultaneous briefing by both parties—due within twenty-one days of the Third Circuit's panel decision—by February 6, 2026. The BIA's simultaneous briefing schedule conflicted with the regulation governing the timing of appeal briefs in non-detained cases such as Mr. Khalil's. *See* 8 C.F.R. § 1003.3(c)(1); BIA Practice Manual Ch. 3.7(a)(1). Mr. Khalil and DHS subsequently conferred and filed a joint motion seeking a revised briefing schedule consistent with their agreement in federal court.

On April 9, 2026, nine days after the close of briefing, the BIA issued a decision dismissing Mr. Khalil's appeal and denying his motion to remand proceedings to the

---

[6] *See* 8 C.F.R. § 1003.1(g) ("Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board and decisions of the Attorney General are binding on all officers and employees of DHS or immigration judges in the administration of the immigration laws of the United States.").

[7] *See* Exhibit C, Declaration of Zabdi J. Salazar (showing that as of February 2026, the average processing time at the BIA for a non-detained case like Mr. Khalil's was 795 days).

[8] *See* Exhibit D, Declaration of Benjamin R. Winograd. As explained below, per the *New York Times*, there is now new evidence showing that the BIA specifically expedited the processing and handling of Mr. Khalil's case, even before the IJ had issued her removal order.

[9] The BIA had previously instructed the parties to notify the Board "when the Third Circuit decides the appeal," and indicated that a briefing schedule would be issued thereafter. The BIA's January 15 notice issued before the parties had provided the Board with any such notice.

immigration court to present highly relevant evidence of First Amendment retaliation that came to light, after Mr. Khalil's removal proceedings before the IJ concluded and after the Third Circuit panel issued its split decision, through discovery in *American Association of University Professors v. Rubio*, Case No. 1:25-cv-10685-WGY (D. Mass.).

In its decision, issued nine days after Mr. Khalil filed his petition for rehearing en banc in his Third Circuit proceedings, the BIA indicated it was unaware of whether a petition for rehearing en banc had actually been filed, and therefore concluded that the mandate in Mr. Khalil's Third Circuit case had issued and that the district court's injunction no longer bound the BIA. This legal and factual error by the BIA, *see supra* n.4, is impossible to square with reality, given that the BIA is a party to Mr. Khalil's extremely high-profile Third Circuit proceedings and had previously made clear it was immediately updated on developments in the case.

The BIA issued its April 9 decision as unpublished, meaning it was not public and lacked precedential value. Then, six days later, the BIA made the determination to publish the decision in Mr. Khalil's case on April 15, 2026. *See Matter of M-K-*, 29 I&N Dec. 556 (BIA 2026). The publication process the BIA used in this instance is unusual. A review of published decisions by the BIA demonstrates that decisions are typically either published on the date the decision is issued, or, if they are published at a later date, are designated as precedent pursuant to an order by the Attorney General. *See* 8 C.F.R. § 1003.1(g)(3) (2026); AG/BIA Precedent Decisions, https://www.justice.gov/eoir/ag-bia-decisions. In Mr. Khalil's case, however, the BIA itself designated the decision as precedent a week after publication, a process that, while provided for by regulation, *see* 8 C.F.R. § 1003.1(g)(3) (providing for designation of precedent by the BIA upon the vote of a majority of permanent members), does not appear to have been followed in any other recent cases selected for publication *after* an unpublished decision was initially issued. *See* 29 I&N Dec. 556 at n.1. The published decision continued to maintain that there was no evidence that the mandate in the Third Circuit case had not yet issued, despite a motion Mr. Khalil had filed contesting that error.

The *New York Times* reported on May 8, 2026, that "[i]nternal [B]oard documents obtained by the New York Times show that the case was considered high priority even before the [B]oard officially received it." *See* Exhibit B, *New York Times* Article. "A note from an internal case-tracking file from June [2025] said that, even though Mr. Khalil had been released several days earlier, the case was to be handled as if he were still in detention, which would speed it along." *Id.* Later notes reflect that Board personnel were instructed to "Please process as quickly as possible," and that Mr. Khalil's appeal was overseen by the Board's "highest ranking member"[10] from early on, even though, on information and belief, appeals are supposed to be randomly assigned. *Id.*

The *New York Times* also reports that, in the process undertaken to determine whether to publish the decision, several current members of the BIA recused from the publication vote. *Id.* The BIA's Ethics and Professionalism Guide for Members of the

---

[10] Garry D. Malphrus is currently the Chief Appellate Immigration Judge, and he is one of the AIJs who issued the BIA's decision in Mr. Khalil's case.

Board of Immigration Appeals provides that "[a] Board Member is banned from adjudicating any cases in which he/she participated personally and substantially prior to becoming a Board Member. A Board Member may not adjudicate a case if he/she: has personal knowledge of the disputed facts; participated as counselor or advisor in the case; or expressed an opinion concerning the merits of the particular case in controversy."[11] Based on this ethical guidance, it is a reasonable inference that the BIA members who recused (as well as those who stated they should recuse but participated anyway) did so because they had been involved in the decision-making and/or drafting process of the underlying IJ decisions, or otherwise participated in the adjudication of Mr. Khalil's case before it reached the BIA.

Influence by BIA members or other federal agencies or officials on the decisions issued in Mr. Khalil's case would be a clear violation of the IJ's regulatory duty to impartially decide cases. *See* 8 C.F.R. § 1003.10(b) ("In deciding the individual cases before them, and subject to the applicable governing standards set forth in paragraph (d) of this section, immigration judges *shall* exercise their independent judgment and discretion[.]…In all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations.") (emphasis added).

Further, any exercise of control by the individual BIA members over the decision-making process in Mr. Khalil's proceedings would be a violation of the members' ethical and regulatory obligations in their prior roles. As just a few examples, Board member Sirce Owen was Acting Director of EOIR during the entire pendency of Mr. Khalil's removal proceedings before IJ Comans.[12] The Director of EOIR "shall have no authority to adjudicate cases arising under the Act or regulations or to direct the result of an adjudication assigned to the Board, an immigration judge, the Chief Administrative Hearing Officer, or an Administrative Law Judge."[13] Board member Stephanie Gorman, meanwhile, served on detail as the Acting Assistant Director of the Office of Policy between February 2025 and October 2025. Pursuant to regulation, the Assistant Director for Policy "shall not direct the result of an adjudication assigned to the Board, an immigration judge, the Chief Administrative Hearing Officer, or an Administrative Law Judge."[14] Board member Gregory Radics, who was appointed to the BIA in January 2026, was in the General Counsel's office during the pendency of Mr. Khalil's removal proceedings. Pursuant to regulation, "the General Counsel shall have no authority, directly or indirectly, to direct or influence the adjudication of any cases under the Act."[15]

Mr. Khalil and the public have a significant interest in discovering whether agency

---

[11] *See* Ethics and Professionalism Guide for Members of the Board of Immigration Appeals, Section XI, May 4, 2011, available at https://www.justice.gov/d9/pages/attachments/2017/08/24/bia_ethics_and_professionalism_guvide_for_board_members.pdf.
[12] *See* EOIR, *Board of Immigration Appeals*, available at https://www.justice.gov/eoir/board-of-immigration-appeals#board.
[13] 8 C.F.R. § 1003.0(c).
[14] 8 C.F.R. § 1003.0(e)(2).
[15] 8 C.F.R. § 1003.0(f).

employees or other government officials unlawfully directed or participated in the adjudication of his case and deprived him of his due process right to a full and fair hearing. As noted below, Mr. Khalil's case has attracted national and international attention. Moreover, the politicization of removal proceedings has become an issue of increasing concern.[16]

## III. Requested Records

### A. Personal Information

The following information should be used in identifying the records requested:

Full name: Mahmoud Khalil
Date of Birth: January 1, 1995
A-Number: # 233698925

CCR, Van Der Hout LLP, and Mahmoud Khalil also make this request under the Privacy Act, 5 U.S.C. § 552a. Mahmoud Khalil consents to the disclosure pursuant to this request of personal information relating to himself. Appropriate forms signed by Mr. Khalil are attached to this request as Exhibit A.

### B. Request for Information

Van Der Hout LLP, CCR, and Mr. Khalil request disclosure of any and all RECORDS[17] as stated below within twenty days:

1. All RECORDS, including but not limited to all emails, complete email chains, email attachments, calendar invitations, and other types of electronic

---

[16] *See, e.g.*, Jason A. Cade, "Welcome To The Trump Administration's Board Of Immigration Appeals. The Immigrant Always Loses," *Yale Law Journal* (forthcoming 2026) ("The Trump administration has used the Attorney General's self-referral power and a reconstituted, ideologically aligned Board to issue approximately 89 precedential decisions, at more than three times the historical pace, in its first fourteen months. The goal is to engineer a body of precedents that reliably produces one result: removal."); *see also* "How Trump Purged Immigration Judges to Speed Up Deportations," *NY Times* (Apr. 9, 2026), https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html?unlocked_article_code=1.a1A.s3Hs.sqD3-VVgPTof&smid=url-share; "Military Lawyer Swiftly Fired from Immigration Bench After Defying Trump Deportation Push," *Associated Press*, Military.com, Dec. 19, 2025, https://www.military.com/daily-news/2025/12/19/military-lawyer-swiftly-fired-immigration-bench-after-defying-trump-deportation-push.html; *Singh v. Valdez*, No. 26-CV-1109-WJM, 2026 WL 890240, at *5 (D. Colo. Apr. 1, 2026) ("the mounting evidence that bond determination hearings conducted in Immigration Court … have preordained outcomes has become impossible to ignore").

[17] In this request the term "RECORD(S)" includes, but is not limited to, all records or communications preserved in electronic (including metadata) or written form, such as correspondences, emails, Signal messages, social media website (Instagram, Facebook, WhatsApp, or others) direct messages, texts, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, legal opinions, protocols, reports, rules, talking points, technical manuals, technical specifications, training manuals, studies, or any other record of any kind. Without limitation, the records requested include records at any stage of development, whether proposed, draft, pending, interim, final, or otherwise.

communications including but not limited to Signal messages, texts, and direct messages on social media, shared or exchanged between (a) any of the individuals or entities (or their employees) listed in Column A below and (b) any of the individuals or entities (or their employees) listed in Column B, that refer to Mahmoud Khalil (by full or partial name, full or partial A number, and any/or other identifying code) **between March 1, 2025 and December 31, 2025**:

| **Column A** | **Column B** |
|---|---|
| Jamee E. Comans | Office of Attorney General, DOJ |
| Bryan Kessler | Office of the Deputy Attorney General, DOJ |
| Melissa Nugent | Office of the Associate Attorney General |
| Jonica Brown | Civil Division, DOJ |
| Katie Rowe | Director, EOIR |
| Felicia Moorehead | Office of Policy, EOIR |
| Erin Taylor | Office of General Counsel, EOIR |
| Any other clerks, deputies, or secretaries who worked with Jamee E. Comans during the relevant period | Office of the Chief Immigration Judge, EOIR |
| LaSalle Immigration Court employees / officials | Board of Immigration Appeals |
| | Garry D. Malphrus |
| | Stephanie E. Gorman |
| | Gregory Radics |
| | Roman Marian Chaban |
| | Michael J. Creppy |
| | Sheila E. Gallow |
| | Marcos Gemoets |
| | Deborah K. Goodwin |
| | Renae M. Hansell |
| | Keith E. Hunsucker |
| | Sunita B. Mahtabfar |
| | Philip J. Montante Jr. |
| | Hugh Mullane |
| | Sirce E. Owen |
| | Kathleen K. Volkert |
| | John M. Gillies |
| | Paul A. McCloskey |
| | Georgina M. Picos |
| | Jeb T. Terrien |
| | U.S. Department of Homeland Security and its subcomponents (excluding court filings that were also served upon Mr. Khalil's counsel) |

| | |
|---|---|
| | Any governmental entity or governmental employee who is not listed above, including but not limited to Stephen Miller, the White House and its employees, and the U.S. Department of State and its employees |
| | Any non-governmental entity or individual |

2. Any RECORDS, including but not limited to all emails, complete email chains, email attachments, calendar invitations, and other types of electronic communications including but not limited to Signal messages, texts, and direct messages on social media, in the custody of, or any communication(s) between, any person working for any component, office or division of the DOJ, including EOIR, the BIA, and the OCIJ, from March 1, 2025 to present regarding:
    a. Any involvement by current or former (both permanent and temporary) BIA members or other DOJ officials in the decision-making or drafting of any decisions by IJ Jamee E. Comans in Mr. Khalil's case, including but not limited to:
        i. the removability decision that she delivered orally on April 11, 2025;
        ii. the manner in which she conducted the Individual Calendar Hearings on April 11, 2025 and or May 22, 2025;
        iii. the written removal order issued on June 20, 2025;
        iv. the written order denying a bond hearing issued on June 20, 2025;
        v. the written order vacating the finding of removability under the Foreign Policy Ground issued on July 31, 2025;
        vi. the written removal order issued on September 12, 2025.
    b. Any involvement by any past or current supervisory employees of the OCIJ in the decision-making or drafting of any decisions by IJ Comans in Mr. Khalil's removal proceedings;
    c. Any involvement by any past or current employees of the EOIR Office of Policy in the decision-making or drafting of any decisions by IJ Comans in Mr. Khalil's removal proceedings;
    d. Any involvement by past or current employees of the EOIR Office of the General Counsel in the decision-making or drafting of any decisions by IJ Comans in Mr. Khalil's removal proceedings;
    e. Any involvement by past or current employees of the Office of the Attorney General, Office of the Deputy Attorney General, Office of the Associate Attorney General, or the DOJ Civil Division in the decision-making or drafting of any decisions by IJ Comans in Mr. Khalil's removal proceedings;
    f. Any involvement by Stephen Miller or past or current employees of the White House, Department of State, or Department of Homeland Security (other than its filings served upon Mr. Khalil's counsel) in the decision-

making or drafting of any decisions by IJ Comans in Mr. Khalil's removal proceedings;

g. Any involvement by non-governmental entities or individuals in the decision-making or drafting of any decisions by IJ Comans in Mr. Khalil's removal proceedings.

3. Any RECORDS in the custody of, of communication(s) between, any person working for any component, office or division of the DOJ, including but not limited to EOIR, the BIA, and the OCIJ, from March 1, 2025 to present regarding:
   a. The decision to publish the BIA decision in Mr. Khalil's case on April 15, 2026, six days after the BIA issued the unpublished decision on April 9, 2026;
   b. The number of BIA members who participated in a vote to publish the decision;
   c. The decision of any current permanent or temporary BIA members to recuse from the publication vote and the basis for any such recusal;
   d. The decision of any current permanent or temporary BIA members to recuse from handling, processing, or adjudicating Mr. Khalil's appeal at any time;
   e. The status of the filing of Mr. Khalil's petition for rehearing en banc in the Third Circuit, including but not limited to information regarding the fact that the mandate had not yet issued (but not including public court documents and Westlaw/LEXIS decisions);
   f. Information regarding the status, scope, interpretation, or any other details regarding the orders, injunctions, stays, and other decisions issued by the federal courts adjudicating Mr. Khalil's habeas petition in the District of New Jersey and his habeas appeal and petition for rehearing en banc in the Third Circuit (but not including public court documents and Westlaw/LEXIS decisions).

### C. <u>Format of Production</u>

With respect to the form of production, *see* 5 U.S.C. § 522(a)(3)(B), please search for responsive records regardless of format, medium, or physical characteristics, and including electronic records. Please provide the requested document in the following format:

- In PDF format wherever possible;
- Not password-protected;
- Each page Bates-numbered chronologically;
- Electronically searchable text wherever possible;
- "Parent-child" relationships maintained, meaning that the requestor must be able to identify the attachments with emails;
- Any data records in native format (*i.e.*, Excel spreadsheets in Excel);
- Emails should include BCC and any other hidden fields;
- With any other metadata preserved.

### D. Requesters

Mahmoud Khalil is a thirty-one-year-old Palestinian who is married to a U.S. citizen, with whom he shares a one-year-old U.S. citizen son. Mr. Khalil is one of a number of international students who have been targeted by a government policy to retaliate – through immigration detention and deportation – against students and scholars protesting U.S. complicity in Israel's ongoing assault on Gaza.

Van Der Hout LLP is a for-profit law firm that handles a significant amount of work on a pro bono basis. Additionally, attorneys, noncitizens, and other interested members of the public may obtain information about immigration-related issues through its distribution of records, including its website, and through public and educational appearances.

The Center for Constitutional Rights ("CCR") is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around immigration, as well as racial and ethnic profiling. One of CCR's primary activities is the publication of newsletters, know-your-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These and other materials are available through CCR's Development, Communications, and Advocacy Departments. CCR operates a website, http://ccrjustice.org, which addresses the issues on which CCR works. CCR staff members often serve as sources for journalists and media outlets, including on issues related to racial justice, racial discrimination, and immigrant rights. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and also issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work.

### E. Request for Fee Waiver

Van Der Hout LLP and CCR, along with Mr. Khalil, are entitled to a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) on the grounds that "disclosure of the requested records is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester." *Id.* § 552(a)(4)(A)(iii). Van Der Hout LLP and CCR meet the requirements for a fee waiver because the subject of the request concerns the operations or activities of the government, the disclosure of the information is likely to contribute to a significant public understanding of government operations or activities, the Requesters' primary interest is in disclosure, and they have no commercial interest in the information. *See* 6 C.F.R. § 5.11(b); 22 C.F.R. § 171.16(a); 28 C.F.R. § 16.10(k).

As described above, CCR is a non-profit organization dedicated to educating the public and advocating for civil rights, human rights, and immigrant rights, and have undertaken this work in the public interest and not for any private commercial interest. Similarly, Van Der Hout LLP's representation of Mr. Khalil is pro bono and not for any private commercial interest. Further, the primary purpose of this FOIA request is to obtain information to further the public's understanding of unlawful actions within a government

agency, and the weaponization of the administrative immigration system to punish constitutionally protected activity. Access to this information is crucial for Van Der Hout and CCR, and the communities we serve, to evaluate government procedures and actions, as well as their potential detrimental effects.

Van Der Hout LLP and CCR have no commercial interest in the requested information. Disclosure in this case, therefore, meets the statutory criteria, and a fee waiver would fulfill Congress' legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309,1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers of noncommercial requesters.'") (citing *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987)).

In the alternative, if no fee waiver is granted and the fees exceed $250.00, please contact Van Der Hout and CCR to obtain consent to incur additional fees. Processing fees should be limited pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("[F]ees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media.").

**F. <u>Expedited Processing</u>**

Van Der Hout and CCR are entitled to expedited processing of this request because there is a "compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I). A "compelling need" is established when there exists an "urgency to inform the public about an actual or alleged Federal Government activity," when the requester is a "person primarily engaged in disseminating information." *See* 6 C.F.R. § 5.5(d)(ii); 22 CFR § 171.11(f); 28 C.F.R. § 16.5(e)(ii).

As described in Part E above, CCR is significantly engaged in disseminating information and community advocacy in support of fundamental civil rights and the rule of law, and has a proven track-record of compiling and disseminating information and reports to the public about government functions and activities. Furthermore, CCR will also disseminate any records released to its broad membership base at no cost.

In addition, the agencies grant expedited processing where the subject of the request is a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(iv). Mr. Khalil's case has garnered a significant amount of public attention and media interest, and widespread criticism of the government's actions. The impropriety of EOIR during the adjudication of his case, and those of other noncitizens similarly targeted for engaging in constitutionally protected speech critical of Israel, has garnered significant public scrutiny. The more information we have, and the sooner we obtain it, the more fully Mr. Khalil and similarly situated student activists can understand the ongoing threats to their freedom, including the threat of detention and deportation, for exercising their bedrock constitutional rights. Additionally, the requested information is critical to evaluating the violations of Mr. Khalil's due process rights during the agency's adjudication of his case, which resulted in a final order of removal that may very well be

legally invalid based on the agency's apparent violations of numerous of its regulations. Mr. Khalil's personal safety and ability to remain with his family in the United States may be negatively impacted if this information is not disclosed on an expedited timeline.

**Conclusion**

Van Der Hout LLP and CCR expect a determination of this request by each agency for records within 20 days, as provided by statute. *See* 5 U.S.C. § 552(a)(6)(A)(i).

If our request is denied, in whole or in part, we ask that each agency justify all deletions by reference to specific exemptions to FOIA. We also expect each agency to release all segregable portions of otherwise exempt material. Van Der Hout and CCR reserve the right to appeal each agency's decision to withhold any information.

Thank you for your prompt attention to this matter. Please furnish all applicable records to: **Johnny Sinodis, Van Der Hout LLP at jsinfoia@vblaw.com (preferred)** or by mail at Johnny Sinodis, Van Der Hout LLP, 360 Post Street, Suite 800, San Francisco, CA 94108.

I certify that the above information is true and correct to the best of my knowledge.

Johnny Sinodis
Van Der Hout LLP
jsinfoia@vblaw.com

# EXHIBIT A

**U.S Department of Justice**

# Certification of Identity

FORM APPROVED OMB NO. 1103-0016
EXPIRES 04/30/27

**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The primary purpose for the collection of the information on this form is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. The authority by which information is collected on this form is 5 U.S.C. § 552 and 5 U.S.C. § 552a(a), as well as 28 CFR Section 16.41(d). Any information you provide may also be disclosed pursuant to a "routine use" under the Privacy Act of 1974, 5 U.S.C. § 552a, listed in a DOJ System of Records Notice, which may include: JUSTICE/DOJ-004 Freedom of Information Act, Privacy Act, and Mandatory Declassification Review Records (CMS) for the Department of Justice, available at https://www.justice.gov/opcl/doj-systems-records#DOJ. Your disclosure of information to the Department of Justice on this form is voluntary. If you do not complete all or some information fields in this form, however, the Department of Justice may not be able to effectively respond to your request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. § 1001 and/or 5 U.S.C. § 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1] Mahmoud Khalil

Citizenship Status [2] LPR Social Security Number [3] 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

Current Address 830 Pinehill Road, Jena, LA 71342

Date of Birth 01/01/1995 Place of Birth Syria

## OPTIONAL: Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

Ian Head and Samah Sisay, Center for Constitutional Rights; Johnny Sinodis, Van Der Hout LLP

**Print or Type Name**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

**Signature [4]** Mahmoud Khalil **Date** 05/28/2025

[1] Name of individual who is the subject of the record(s) sought.

[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.

[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.

[4] Signature of individual who is the subject of the record sought.

**U.S. Department of Justice**
Executive Office for Immigration Review

OMB# 1125-0017
**Certification and Release of Records**

## Part A. Information Regarding the Alien or Subject of the Records Sought

| | |
|---|---|
| 1. Alien Registration Number(s) (if any)<br>233698925 | 2. Current Legal Name (Last, First, Middle)<br>KHALIL, Mahmoud |

3. Other Names You Have Been Known By Since Birth:

4. Current Address in the United States

| | |
|---|---|
| Street Number and Name<br>C/O 360 Post Street | Apartment Number or Unit Number (if any)<br>Suite 800 |

| City | State | Zip Code | Telephone Number |
|---|---|---|---|
| San Francisco | CA | 94108 | (415) 821-8820 |

5. Previous Address in the United States (if applicable)

| | |
|---|---|
| Street Number and Name | Apartment Number or Unit Number (if any) |

| City | State | Zip Code | Telephone Number |
|---|---|---|---|
| | | | |

| 6. Date of Birth (mm/dd/yyyy) | 7. Country of Nationality or Citizenship | 8. Place of Birth |
|---|---|---|
| | | |

9. (Check One) ◉ Release all of my records ○ Only release the following records: (specify exact records you wish to be released)

## Part B. Recipient's Information

| | |
|---|---|
| 1. Recipient's Full Name (Last, First, Middle)<br>VAN DER HOUT, Marc | 2. Recipient's Organization (if applicable)<br>Van Der Hout, LLP |

3. Recipient's Mailing Address
In Care of Name (if any) Marc Van Der Hout

| | |
|---|---|
| Street Number and Name<br>360 Post Street | Apartment Number or Unit Number (if any)<br>Suite 800 |

| City | State | Zip Code | Telephone Number |
|---|---|---|---|
| San Francisco | CA | 94108 | (415) 821-8820 |

4. Recipient's Email Address
mvfoia@vblaw.com

| | |
|---|---|
| 5. Recipient's relationship to subject<br>Attorney | 6. Recipient's EOIR-ID Number (if any)<br>CY370447 |

By my signature below, unless otherwise specified above, I consent to EOIR releasing any and all information relating to me to the above-named Recipient. This consent will allow the Recipient to receive and/or examine potentially sensitive information and documents. If filing this request on my own behalf, I also consent to pay all costs incurred for search, duplication, and review of documents up to $25.

I further declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named in Part A above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. § 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both.

**Subject of Record's Signature** Mahmoud Khalil **Date** 03/27/2025

# EXHIBIT B

# *Mahmoud Khalil Hurtles Toward Potential Deportation as U.S. Speeds Case*

A key judicial decision in Mr. Khalil's immigration case was expedited significantly and included the recusal of multiple judges.

Listen · 9:25 min




**By Jonah E. Bromwich and Nicholas Nehamas**

May 8, 2026, 2:39 p.m. ET

See more of our coverage in your search results.

**Add The New York Times on Google ↗**

Mahmoud Khalil, a Columbia University graduate who became the face of President Trump's crackdown on pro-Palestinian protesters, could be deported before the Supreme Court hears his case after an unusually speedy decision from a court within the Justice Department.

The decision last month included the recusal of multiple judges, continuing a pattern of abnormality that has marked the case from its outset. It concluded with the court upholding a lower immigration court's finding that Mr. Khalil could be expelled from the United States.

Mr. Khalil, 31, a legal permanent resident who is married to an American wife, mediated when Columbia and protesters clashed during demonstrations that rocked the university's campus in 2024. The next year, after Mr. Trump had

returned to the White House, Mr. Khalil was arrested and the administration moved to deport him.

Though it is part of the Justice Department, the court that made last month's decision, called the Board of Immigration Appeals, is required by law to make decisions independently.

Internal board documents obtained by The New York Times show that the case was considered high priority even before the board officially received it. A note from an internal case-tracking file from June said that, even though Mr. Khalil had been released several days earlier, the case was to be handled as if he were still in detention, which would speed it along.

"Please process as quickly as possible," said another note, from October. Another document shows that the court's chair — its highest ranking member — oversaw the case from early on.

The board made its decision within nine days of the final court papers being filed in the case. Such decisions typically come years after papers are filed in cases in which the noncitizen is not detained.

"That kind of timeline is unprecedented," said Homero López, who was appointed to the board under President Joseph R. Biden Jr. and then fired under Mr. Trump. "It's an insane turnaround, particularly for such a high-profile case on a novel legal issue."

Additionally, at least three judges recused themselves from the process, according to people with knowledge of the matter.

The reason for the recusals is unclear. But the recusal of more than one judge is highly unusual.

Andrea Saenz, a former board judge who was fired by the administration in March 2025, said recusals would typically happen when judges had a conflict of interest, often because they had been involved in a case before it reached the appeals stage.

"For there to be multiple judges recusing from a case, especially a high-profile case, raises questions about whether they had somehow been looped into the case at an earlier stage," she said, asking: "How many people touched this case when the immigration judge was handling it the first time?"

A Justice Department official said that the department could not comment on "specifics from alleged files we have not seen by time of publication," adding that Mr. Khalil's case was first filed in the relevant system when he was in detention. "The time frame is not abnormal for a detained case," the official added.

Under Mr. Trump, the Justice Department has moved to exert closer control over the appeals board, slashing the number of judges, firing Biden-era appointees and filling the remaining spots with lawyers seen as aligned with the president's agenda. The board has since churned out decisions, often making it easier for the government to detain and deport immigrants. At the same time, the administration has sought to reshape the immigration court system more broadly, dismissing judges whose decisions run counter to the White House's policy preferences.

The unusual aspects of the Khalil case have raised questions among immigration lawyers and other close observers of the system about the potential influence of Trump administration officials, who have sought to make an example of Mr. Khalil since his arrest. The Justice Department has faced criticism for targeting the administration's political enemies.

Marc Van Der Hout, the lead lawyer in Mr. Khalil's immigration case, said that the abnormalities showed that the case "has been controlled from Day 1 by higher-ups in the administration."

A White House spokeswoman, Abigail Jackson, did not directly address the question of White House involvement, but said in a statement that "the executive branch has the lawful authority to take actions that will protect the public and to ensure the integrity of our immigration system."

She accused Mr. Khalil of obtaining his visa “by willfully and intentionally failing to accurately report information relevant to his background,” which Mr. Khalil has denied doing.

David McConnell, a former senior Justice Department official who handled immigration appeals, said that the speed of the decision and the number of recusals were “very unusual” but not necessarily a signal of something nefarious. During previous administrations, he said, senior officials would occasionally fast-track cases that presented pressing legal issues.

“They can move quickly when there is some particular reason to do it,” Mr. McConnell said. “The ultimate question is: Were the board members correct? Did they get the law right?”

Secretary of State Marco Rubio, as part of the effort to deport Mr. Khalil, cited a rarely-used statute, declaring that Mr. Khalil should be expelled because his presence in the United States spread antisemitism to a degree that could threaten American foreign policy interests. (Mr. Khalil, who comes from a family of Palestinian refugees, has repeatedly condemned antisemitism and argued that protesting on behalf of Palestinians is not inherently anti-Jewish.)

His arrest spurred questions about whether Mr. Rubio’s determination ran afoul of the First Amendment. The government added a new rationale for deporting him, saying that Mr. Khalil had willfully failed to disclose that he was a “member” of a United Nations agency for Palestinian refugees — widely known as UNRWA — when he applied to become a permanent U.S. resident in March 2024, among other failures of disclosure.

Mr. Khalil, who is fighting the case both in immigration court and Federal District Court, has argued that those allegations do not match up with reality.

The district court judge evaluating Mr. Khalil’s case, Michael E. Farbiarz, concluded after several months that Mr. Rubio’s declaration was most likely unconstitutional and that it would be highly unusual for the United States to keep Mr. Khalil in detention for the other allegations. He freed Mr. Khalil in June 2025.

By then, Mr. Khalil had missed the birth of his child, and his future in the United States remained in doubt. In January, a federal appeals court ruled that Judge Farbiarz had not had the authority to free Mr. Khalil and that immigration court was the appropriate venue for his case at that time.

That ruling made the Board of Immigration Appeals's swift pair of decisions last month all the more important.

The board is the highest level of immigration court before cases move into federal appeals court. It held that Mr. Khalil could be deported both because of Mr. Rubio's determination and because of the paperwork allegations.

A first judge recused before the initial decision was made, according to the people with knowledge of the process. The board then moved to "publish" the case — a larger vote that classifies a case as precedent-setting, meaning that its findings would apply to relevant immigration cases going forward. The other recusals came during that process, the people said.

Mr. Khalil has asked a full federal appeals court to review the January decision that granted authority to the immigration court, and it is expected to rule in the coming days. If it decides not to take up his case — and his lawyers are unsuccessful in persuading federal judges to pause the effect of the appeals courts' ruling — Mr. Khalil could soon be expelled from the United States.

Kitty Bennett contributed research.

**Jonah E. Bromwich** covers criminal justice in the New York region for The Times. He is focused on political influence and its effect on the rule of law in the area's federal and state courts.

**Nicholas Nehamas** is a Washington correspondent for The Times, focusing on the Trump administration and its efforts to transform the federal government.

# EXHIBIT C

# DECLARATION OF ZABDI J. SALAZAR ON BIA NON-DETAINED CASE APPEALS PROCESSING TIMES, COHORT COMPOSITION, AND OUTCOME PATTERNS

I, Zabdi J. Salazar, do depose and state:

## INTRODUCTION

1. I am a Ph.D. candidate in Jurisprudence and Social Policy at Berkeley Law, where I conduct empirical analysis of immigration adjudication using EOIR administrative case data. A true and correct copy of my curriculum vitae is attached as Exhibit A.
2. For this declaration, I analyzed non-detained case appeals before the Board of Immigration Appeals ("BIA"), focusing on processing times, filing-cohort composition, and outcome patterns in 2024 and 2025 decisions. My analysis shows that these appeals generally take hundreds of days—and often years—to resolve. Against that backdrop, the 2025 decided docket was more heavily weighted toward recently filed appeals than the 2024 docket, even as older cohorts remained pending in substantial numbers. It also included a higher concentration of procedural dismissals. That pattern was especially sharp among appeals filed and decided in 2025, where procedural dismissals were substantially more common than in the corresponding 2024 same-year cohort and favorable outcomes were nearly nonexistent. Within the 2025 decided docket, the fastest resolutions were overwhelmingly procedural or administrative, while remands and substantive adverse outcomes generally took longer to resolve.

## METHODOLOGY

3. I analyzed the Deportation Data Project's processed EOIR removal case-level dataset, a file derived from EOIR administrative records that consolidates selected variables from multiple EOIR source tables, including appeal-related variables, into a single row per removal case. For this declaration, I focused on direct BIA case appeals in non-detained removal cases, defined here as cases coded N or R for custody status. Custody status may change over the course of proceedings. This analysis uses the custody_at_appeal code from the Deportation Data Project's processed EOIR case-level dataset, which reflects custody status at the time of the most recent BIA appeal.
4. I measured completed-case processing time as the number of calendar days between the appeal filing date and the BIA decision date, and pending time as the number of calendar days between the appeal filing date and February 27, 2026. For the recency analysis, I compared the filing-year composition of non-detained case appeals decided in 2024 and 2025, and separately examined the 2025 filing-

cohort composition of both decided appeals and still-pending appeals as of February 27, 2026.

5. For the outcome analysis, I examined filing year, decision year, and BIA decision code, and grouped completed appeals into six categories: Procedural Dismissal, Substantive Adverse, Admin / Withdrawal, Remand, Favorable Merits, and Favorable Non-Merits, as set out in Exh. E (Outcome Category Mapping). "Favorable Non-Merits" captures dispositions that are non-adverse in practical effect but are not merits grants. Remand is treated as a separate category because it returns the case for further proceedings and does not map cleanly onto a simple favorable/unfavorable framework. For the remand-rate analysis, I also examined who filed the appeal, using the filer-type field in the processed EOIR case-level dataset to compare remand patterns by filer type in non-detained BIA case appeals decided in 2024 and 2025.

**FINDINGS: NON-DETAINED CASE APPEAL PROCESSING TIMES**

6. The processing-time data show that non-detained BIA case appeals generally take hundreds of days to resolve, with a strongly right-skewed distribution. Between January 1, 2024 and February 27, 2026, I identified 45,135 completed non-detained case appeals. Exh. B (BIA Appeal Processing Timetables), Table 1. Their mean processing time was 795.4 days and their median processing time was 565 days. The 25th percentile was 157 days, the 75th percentile was 1,520 days, the 90th percentile was 1,797 days, the 95th percentile was 1,982 days, and the maximum observed processing time was 4,130 days. Exh. B, Table 3. The completed docket also skewed older: the largest age bucket consisted of appeals that took more than four years to resolve (26.6%), and 57.3% of completed appeals took more than one year to resolve. Exh. B, Table 4.

7. As of February 27, 2026, I identified 181,972 pending non-detained case appeals. Exh. B, Table 2. The mean pending time was 740.6 days, and the median was 452 days. The 25th percentile was 206 days, the 75th percentile was 1,158 days, the 90th percentile was 1,947 days, the 95th percentile was 2,205 days, and the oldest pending case had been awaiting a decision for 2,613 days. Exh. B, Table 5. The pending docket was also deeply aged: 38.1% of pending non-detained appeals had been awaiting a decision for more than two years, and 17.1% for more than four years. Exh. B, Table 6.

8. These results show that non-detained BIA case appeals often remain pending for long periods and commonly take hundreds of days—and often years—to resolve.

**FINDINGS: RECENCY SHIFT IN THE 2025 DECISION DOCKET**

9. The 2025 decision docket was more heavily weighted toward recently filed appeals than the 2024 docket. Appeals filed in 2025 accounted for 30.6% of non-

detained case-appeal decisions in 2025; by comparison, appeals filed in 2024 accounted for 21.3% of such decisions in 2024. Exh. C (BIA Appeal Cohort and Timing Tables), Table 1. A rolling measure shows the same pattern: among appeals decided in each year, the share filed within the preceding 365 days rose from 38.1% in 2024 to 46.0% in 2025, a statistically significant increase. Exh. C, Table 2.

10. That recency shift appeared alongside an unresolved older docket. Among appeals decided in 2025, only 4.2% came from the 2019 filing cohort, even though 5,652 2019-filed appeals remained pending as of February 27, 2026. Large numbers of older cohorts likewise remained unresolved. Exh. C, Table 3.

11. These patterns are consistent with a 2025 decision docket disproportionately concentrated on recently filed appeals even while many older appeals remained pending.

## FINDINGS: OUTCOME MIX AND DECISION-CODE PATTERNS

### Same-year cohorts

12. Among non-detained case appeals filed and decided in the same year, the share ending in procedural dismissal rose from 29.8% in the 2024 cohort to 47.7% in the 2025 cohort—a statistically significant increase of 17.9 percentage points, making the procedural dismissal share in the 2025 cohort about 60% higher than in the 2024 cohort. Exh. C (BIA Appeal Cohort and Timing Tables), Table 4. In the 2025 same-year cohort, 96.6% of cases ended in procedural dismissal, substantive adverse, or administrative/withdrawal dispositions; favorable outcomes were nearly absent. Exh. C, Table 4.

13. A related breakdown of adverse outcomes shows that procedural adverse dispositions were concentrated in the newest filing cohorts within 2025 decisions. Among adverse decisions issued in 2025, 35.8% of the 2024 filing cohort and 52.4% of the 2025 filing cohort were resolved procedurally rather than substantively. Exh. C, Table 7. This indicates that procedural dismissals were especially common in the newest adverse cohorts, and that among adverse appeals both filed and decided in 2025, procedural dismissals outnumbered substantive adverse outcomes. Exh. C, Table 7.

### Full 2024-versus-2025 decision-year comparison

14. Looking across all non-detained case appeals decided in 2024 and 2025, regardless of filing year, the overall outcome distribution also shifted significantly. Procedural dismissals rose from 15.1% to 23.4%, substantive adverse outcomes fell from 64.0% to 55.2%, administrative or withdrawal

dispositions rose from 1.9% to 3.9%, and remands rose from 11.8% to 14.3%. Exh. C, Table 5.

15. The code-level comparison helps explain that broader change. DIS-coded decisions (dismiss / affirm IJ) fell from 2024 to 2025 while procedural dismissal-coded decisions increased. SDG (summary dismissal—untimely or waived) rose from 3.6% to 8.7%, and SUD (summarily dismissed) rose from 5.8% to 9.2%. Exh. C, Table 6.

16. The rise in the remand share in the full 2025 decision-year docket appears to have been influenced in substantial part by filer mix. Among noncitizen-filed appeals, the remand rate fell from 10.6% in 2024 to 6.2% in 2025. Among DHS-filed appeals, by contrast, the remand rate rose from 53.5% to 82.2%. DHS-filed appeals decided in 2025 were concentrated primarily in the 2023 and 2024 filing cohorts, rather than in same-year 2025 filings. Exh. D (Remand Patterns by Filer Type).

**FINDINGS: TIMING AND OUTCOME SELECTION IN 2025 DECISIONS**

17. Among all non-detained case appeals decided in 2025, timing was strongly linked to outcome. Procedural dismissals had a median processing time of 182 days, compared with 209 days for administrative/withdrawal dispositions, 791 days for remands, 1,009 days for substantive adverse outcomes, 1,235 days for favorable merits outcomes, and 1,163.5 days for favorable non-merits outcomes. Exh. C (BIA Appeal Cohort and Timing Tables), Table 8.

18. The processing-time buckets show the same pattern. Among cases resolved in fewer than 90 days, 75.3% were procedural dismissals and 18.6% were administrative/withdrawal dispositions. In the 1- to 2-year bucket, remands accounted for 54.5% of cases. In the 2- to 4-year bucket, 55.6% of cases were substantive adverse outcomes, and in the 4+ year bucket, 77.8% were substantive adverse outcomes. Exh. C, Table 9.

19. These results indicate that the very fastest 2025 resolutions were overwhelmingly procedural or administrative, whereas remands and favorable outcomes generally took longer and substantive adverse outcomes predominated in the longest-resolution-time buckets.

**CONCLUSION**

20. The data show that non-detained BIA case appeals ordinarily take hundreds of days to resolve, and often years. The data further show that the 2025 decided docket was more heavily weighted toward recently filed appeals than the 2024 docket, with 30.6% of 2025 decisions coming from appeals filed in 2025 itself, even while older cohorts remained pending in substantial numbers. The 2025 decided docket also included a higher concentration of procedural dismissals than

the 2024 docket. That pattern was especially sharp among appeals both filed and decided in 2025, where procedural dismissals outnumbered substantive adverse outcomes and favorable outcomes were nearly nonexistent. Finally, within the 2025 decided docket, the fastest resolved cases were predominantly procedural or administrative outcomes, while remands and substantive adverse outcomes generally took longer to resolve.

**INDEX OF EXHIBITS**


| Exh. | Description | Page(s) |
|---|---|---|
| A | Curriculum Vitae of Zabdi J. Salazar | 1-2 |
| B | BIA Appeal Processing Timetables (Jan. 1, 2024 to Feb. 27, 2026) | 3-5 |
| C | BIA Non-Detained Case Appeals: 2024-2025 Cohort, Outcome, and Timing Tables | 6-10 |
| D | BIA Non-Detained Case Appeals: Remand Patterns by Filer Type | 11-14 |
| E | Outcome Category Mapping for Non-Detained BIA Case Appeals | 15 |


I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2026, at Berkeley, California.

Zabdi J. Salazar

Zabdi J. Salazar

# ZABDI SALAZAR

Berkeley, CA • 512-299-7294 • zsalazar2019@berkeley.edu

## EDUCATION

**University of California, Berkeley, School of Law,** Berkeley, CA
Ph.D. Candidate, Jurisprudence & Social Policy (Expected May 2027)
Juris Doctor, May 2024; State Bar of Texas, admitted October 2024

Dissertation: *The Administrative Ratchet: Executive Power and the Courts in U.S. Asylum Adjudication*
Committee: David Hausman (Co-Chair), Calvin Morrill (Co-Chair), Jennifer Chacon, Rachel Stern
Description: Three-article dissertation examining how executive intervention, deferred judicial review, and circuit-level appellate variation interact to shape asylum adjudication over time.

Field Examinations: Public Law (June 2021); Asylum and the Courts (Dec. 2023); Qualifying Exam (Sept. 2024)

Honors: Berkeley Law Dean's Fellowship; Berkeley Center for Law and Business Scholar; Chancellor's Fellowship for Graduate Study; JSP Cooter-Rubinfeld Fellowship

Methods & Training: ICPSR Summer Program (Modern Difference-in-Difference Designs, 2021; Funding Award); IQMR Certificate, 2021 (Funding Award)

Leadership & Service: *California Law Review*, Vol. 112 Managing Editor; J.D.-Ph.D. Joint Program Committee

**Trinity University,** San Antonio, TX
B.A., *summa cum laude*, in Political Science and Business Administration, May 2019 (Minors in Spanish and Economics)
Honors: Phi Beta Kappa, Beta Gamma Sigma, University Scholar (top 15 students in class)

## PROFESSIONAL EXPERIENCE

**U.S. District Court for the Southern District of Texas,** Houston, TX
Judicial Law Clerk to the Honorable Yvonne Ho — Sept. 2024–Sept. 2025
- Drafted memoranda and recommendations, memorandum opinions and orders, and routine civil orders.
- Conducted complex federal civil research and managed daily docket and motion practice.
- Coordinated closely with chambers staff on case administration and opinion production.

**EOIR, San Francisco Immigration Court,** San Francisco, CA
Law Student Extern — Aug. 2023–Dec. 2023
- Drafted a cancellation-of-removal merits order and an asylum decision involving a family-based PSG.
- Prepared oral decision outlines and credibility analyses; conducted asylum-law research; observed hearings.

**Berkeley Law: Asylum Law Practicum,** Berkeley, CA
Law Student Intern — Jan. 2023–May 2023
- Prepared an affirmative asylum application and letter brief for an Afghan family.
- Drafted detailed client declarations and compiled supporting country-conditions evidence.

**East Bay Community Law Center: Immigration Clinic,** Berkeley, CA
Law Student Intern — Aug. 2022–Dec. 2022
- Conducted general consultations with English- and Spanish-speaking clients regarding immigration-related legal issues and prepared legal documents for DACA renewal, DACA advance parole, and family-based petitions.
- Drafted an asylum brief for an applicant and worked with her to revise and update her declaration.

**U.S. District Court for the Southern District of Texas,** Laredo, TX
Judicial Extern to the Honorable Diana Song Quiroga — Jun. 2022–Jul. 2022

- Researched and drafted memos and orders on civil and immigration-related issues, including alternatives to detention, U-visa certification, hearsay in revocation proceedings, and bond and revocation matters.
- Revised filings in civil discovery disputes, assisted with model rules on court performance standards, and observed daily hearings.

## ACADEMIC EXPERIENCE

**University of California, Berkeley, School of Law,** Berkeley, CA — Sept. 2023–May 2024
Research Assistant to Professor David Hausman (Immigration Law)

- Conducted empirical research supporting a Central America–U.S. migration estimation model, integrating multi-source administrative data (CBP, INM, COMAR), evaluating recidivism and detection assumptions under Title 8 and Title 42, and compiling cross-national demographic and economic indicators to contextualize regional emigration trends.
- Compiled and synthesized post-2019 federal appellate and district court decisions interpreting 8 U.S.C. § 1252(b)(9), analyzing the scope of jurisdiction-channeling and the treatment of collateral constitutional claims in removal-related litigation.

**University of California, Berkeley,** Berkeley, CA
Graduate Student Instructor — Aug. 2020–May 2021

- Planned and delivered lessons for weekly undergraduate discussion sections for two courses: Immigration & Citizenship and Membership & Migration - Empirical and Normative Perspectives.
- Graded assignments, research papers, and exams. Held weekly office hours and review sessions.

## SELECTED PUBLICATIONS AND PRESENTATIONS

- Salazar, Z. "The Executive Pinch: When Executive Power Outruns Judicial Review in Administrative Adjudication." Manuscript in preparation.
- "Immigration Judges & Bureaucracy: The Impact of Case Quotas," *presented at the Berkeley Empirical Legal Studies Fellow Workshop, Center for the Study of Law and Society, Mar. 2, 2023.*
- "The Evolution of the Particular Social Group (PSG) and Domestic Violence Asylum Claims," *presented at the Graduate Seminar Series, UC Davis Global Migration Center, Apr. 30, 2020.*
- Salazar, Z. "Paradoxes of Gender Equality Policies and Domestic Working Conditions in Madrid," *Claremont-UC Undergraduate Research Conference on the European Union Journal*. Vol. 2018, Article 11. Web. Oct. 9, 2018. https://scholarship.claremont.edu/urceu/vol2018/iss1/11

## SELECTED AWARDS AND HONORS

JSP Cooter-Rubinfeld Fellowship, UC Berkeley — Aug. 2026–Dec. 2026
D-Lab AI Latinx Fellow, UC Berkeley — Jan. 2026–May 2026
Social Sciences Research Pathways Graduate Mentor, IRLE — Sept. 2025–May 2026
Teressa K. Lippert Distinguished Service Award (*California Law Review*) — May 2024
BELS Fellow (Berkeley Empirical Legal Studies) — Aug. 2022–May 2023
LEAP Fellow (Berkeley Law, Economics, and Politics Center) — Aug. 2022–May 2023
IRLE Graduate Student Research Award (Institute for Research of Labor and Employment) — Jun. 2021
Prosser Prize in Forced Migration — Dec. 2022

## SKILLS

**Software:** R; RMarkdown; Git/GitHub; LaTeX; VS Code; command line tools
**Languages:** Spanish (Native), French (Intermediate)

# Exhibit B. BIA Appeal Processing Timetables (Jan. 1, 2024 to Feb. 27, 2026)

These tables summarize the volume and timing of completed and pending BIA appeals, with Tables 1 and 2 comparing major appeal types and Tables 3 through 6 reporting summary statistics and age distributions for non-detained case appeals. Completed case figures reflect appeals decided by the BIA from January 1, 2024 through February 27, 2026. Pending-case figures reflect appeals that remained awaiting decision as of February 27, 2026. For direct case appeals, detained cases are those with custody code D, while non-detained cases are those with custody codes N or R.

## Table 1. BIA Completions by Appeal Type (Jan. 1, 2024 to Feb. 27, 2026)

| Appeal Type | Total Completions | Average Processing Time (Days) |
|---|---|---|
| Case Appeals (Detained) | 7,033 | 293.5 |
| Case Appeals (Non-Detained) | 45,135 | 795.4 |
| Appeal of IJ MTR | 2,592 | 517.6 |
| MTR-BIA | 10,781 | 198.5 |

Key point: Among the four appeal categories shown here, non-detained case appeals had the longest average processing time during the period, at 795.4 days.

## Table 2. Currently Pending Docket by Appeal Type (as of Feb. 27, 2026)

| Appeal Type | Pending Cases | Average Days in Queue | Median Days in Queue |
|---|---|---|---|
| Case Appeals (Detained) | 6,993 | 172.7 | 95 |
| Case Appeals (Non-Detained) | 181,972 | 740.6 | 452 |
| Appeal of IJ MTR | 10,248 | 539.7 | 392 |
| MTR-BIA | 6,050 | 431.9 | 262 |

Key point: Non-detained case appeals made up by far the largest pending queue and also had the longest average queue time, with 181,972 pending cases and an average of 740.6 days awaiting decision.

**Table 3. Summary Statistics for Completed Non-Detained Case Appeals**

| Metric | Value |
|---|---|
| Total completions | 45,135 |
| Mean processing time | 795.4 days (about 2 years and 2 months) |
| Median processing time | 565 days (about 1 year and 7 months) |
| Standard deviation | 685.4 days |
| 25th percentile | 157 days |
| 75th percentile | 1,520 days |
| 90th percentile | 1,797 days |
| 95th percentile | 1,982 days (about 5 years and 5 months) |
| Maximum observed | 4,130 days (about 11 years and 4 months) |

Key point: Completed non-detained case appeals remained strongly right-skewed: the mean processing time was 795.4 days, the median was 565 days, and the 95th percentile reached 1,982 days.

**Table 4. Age Distribution for Completed Non-Detained Case Appeals**

| Age Bucket | Cases | Percentage |
|---|---|---|
| < 90 days | 2,377 | 5.3% |
| 90 - 180 days | 10,802 | 23.9% |
| 181 days - 1 year | 6,080 | 13.5% |
| 1 - 1.5 years | 3,021 | 6.7% |
| 1.5 - 2 years | 3,029 | 6.7% |
| 2 - 3 years | 4,725 | 10.5% |
| 3 - 4 years | 3,077 | 6.8% |
| 4+ years | 12,024 | 26.6% |
| **Total** | **45,135** | **100.0%** |

Key point: Completed non-detained case appeals were not concentrated in very recent cases. The largest single bucket was 4+ years (26.6%), and a majority of completed appeals (57.3%) had been pending for more than one year.

**Table 5. Summary Statistics for Pending Non-Detained Case Appeals (as of Feb. 27, 2026)**

| Metric | Value |
|---|---|
| Pending cases | 181,972 |
| Mean days awaiting decision | 740.6 days (just over 2 years) |
| Median days awaiting decision | 452 days (about 1 year and 3 months) |
| 25th percentile | 206 days |
| 75th percentile | 1,158 days |
| 90th percentile | 1,947 days |
| 95th percentile | 2,205 days (just over 6 years) |
| Oldest pending case | 2,613 days (about 7 years and 2 months) |

Key point: Pending non-detained appeals were also deeply aged: the median case had already been waiting 452 days, the 95th percentile reached 2,205 days, and the oldest pending case had been awaiting decision for 2,613 days.

**Table 6. Age Distribution for Pending Non-Detained Case Appeals (as of Feb. 27, 2026)**

| Age Bucket | Cases | Percent of Pending |
|---|---|---|
| < 90 days | 20,503 | 11.3% |
| 90 - 180 days | 19,377 | 10.6% |
| 181 days - 1 year | 41,195 | 22.6% |
| 1 - 1.5 years | 18,870 | 10.4% |
| 1.5 - 2 years | 12,735 | 7.0% |
| 2 - 3 years | 20,348 | 11.2% |
| 3 - 4 years | 17,850 | 9.8% |
| 4+ years | 31,094 | 17.1% |
| **Total** | **181,972** | **100.0%** |

Key point: A substantial share of pending non-detained appeals had already been waiting more than two years (38.1%), and 17.1% had been pending for more than four years.

# Exhibit C. BIA Non-Detained Case Appeals: 2024-2025 Cohort, Outcome, and Timing Tables

These exhibit tables summarize year-over-year changes between 2024 and 2025 and the timing patterns of decisions issued in 2025 in non-detained BIA case appeals using the Deportation Data Project's processed EOIR data. Tables 1-3 address docket composition and recency; Tables 4-7 address outcome mix and decision-code patterns in same-year cohorts, full decision-year comparisons, and adverse 2025 filing cohorts; and Tables 8-9 address processing-time patterns based on outcome.

## I. Docket Composition and Recency Shift

### Table 1. Year-over-Year Filing Cohort Comparison for Non-Detained Case Appeals Decided in 2024 and 2025

| Filing Year | 2024 Decisions | Share of 2024 Decisions | 2025 Decisions | Share of 2025 Decisions |
|---|---|---|---|---|
| 2019 | 4,840 | 21.1% | 805 | 4.2% |
| 2020 | 1,733 | 7.6% | 3,319 | 17.5% |
| 2021 | 1,749 | 7.6% | 1,652 | 8.7% |
| 2022 | 4,219 | 18.4% | 1,983 | 10.4% |
| 2023 | 5,485 | 23.9% | 1,695 | 8.9% |
| **2024** | **4,888** | **21.3%** | 3,717 | 19.6% |
| **2025** | 0 | 0.0% | **5,806** | **30.6%** |

Key point: The 2025 docket was more recency-weighted than the 2024 docket: appeals filed in 2025 accounted for 30.6% of decisions issued in 2025, compared with 21.3% for 2024-filed appeals among decisions issued in 2024.

*Note: This table compares the filing-year composition of all non-detained case appeals decided in 2024 with those decided in 2025. Rows for 2017 and 2018 are omitted as de minimis.*

### Table 2. Share of Non-Detained Case Appeals Filed Within 12 Months Before Decision

| Decision Year | Total Decisions | Filed Within Prior 12 Months | Share Within Prior 12 Months |
|---|---|---|---|
| 2024 | 22,930 | 8,737 | 38.1% |
| 2025 | 18,999 | 8,746 | 46.0% |

Key point: The share of decisions involving appeals filed within the prior 12 months increased from 38.1% in 2024 to 46.0% in 2025. These were also the highest shares observed in the 2019–2025 series.

*Note: For each decision year, this measure reflects the share of appeals decided in that year that were filed within 365 days before the BIA decision date. This rolling measure provides a calendar-neutral way to assess recency. The increase from 38.1% in 2024 to 46.0% in 2025 is statistically significant (two-sample test of proportions, $p < 0.001$; 95% CI for the difference, 7.0 to 8.9 percentage points).*

### Table 3. Filing Cohort Distribution of Non-Detained Case Appeals Decided in 2025, with Pending Counts

| Filing Year | Decided in 2025 | Share of 2025 Decisions | Still Pending (Feb. 27, 2026) |
|---|---|---|---|
| 2019 | 805 | 4.2% | 5,652 |
| 2020 | 3,319 | 17.5% | 14,505 |
| 2021 | 1,652 | 8.7% | 9,164 |
| 2022 | 1,983 | 10.4% | 16,406 |
| 2023 | 1,695 | 8.9% | 20,482 |
| 2024 | 3,717 | 19.6% | 27,776 |
| 2025 | 5,806 | **30.6%** | 74,081 |
| 2026 | 0 | 0.0% | 13,906 |

Key point: The largest share of non-detained case appeals decided in 2025 came from cases filed in 2025 itself (30.6%), while older cohorts remained pending in substantial numbers as of February 27, 2026.

*Note: This table displays filing-year cohorts for non-detained case appeals decided in 2025, together with still-pending counts measured as of February 27, 2026. Rows for 2017 and 2018 are omitted as de minimis; the 2026 row reflects appeals filed by February 27, 2026 that remained pending as of that date.*

## II. Outcome Mix and Decision-Code Patterns

### Table 4. Outcome Mix for Non-Detained Case Appeals Filed and Decided in the Same Year (2024 vs. 2025)

| Outcome Category | 2024 Count | 2024 Share | 2025 Count | 2025 Share | Change (pp) |
|---|---|---|---|---|---|
| Procedural Dismissal | 1,457 | 29.8% | 2,767 | 47.7% | **+17.9** |
| Substantive Adverse | 2,922 | 59.8% | 2,517 | 43.4% | -16.4 |
| Admin / Withdrawal | 87 | 1.8% | 317 | 5.5% | +3.7 |
| Remand | 369 | 7.5% | 196 | 3.4% | -4.1 |
| Favorable Merits | 8 | 0.2% | 0 | 0.0% | -0.2 |
| Favorable Non-Merits | 45 | 0.9% | 9 | 0.2% | -0.7 |

Key point: Among same-year cohorts, procedural dismissals rose from 29.8% in 2024 to 47.7% in 2025 (up 17.9 points; 95% CI, 16.0 to 19.7; Holm-adjusted $p < 0.001$), while substantive adverse outcomes fell from 59.8% to 43.4%. In the 2025 same-year cohort, 96.6% of cases ended in procedural dismissal, substantive adverse, or administrative/withdrawal dispositions, and favorable outcomes were nearly nonexistent.

*Note: This table compares the disposition mix of non-detained case appeals filed and decided in the same year. The 2024 same-year cohort includes 4,888 cases; the 2025 same-year cohort includes 5,806 cases. Percentages may not sum to exactly 100.0% due to rounding. The overall outcome distribution differs significantly between the 2024 and 2025 same-year cohorts (Pearson's chi-squared test, $p < 0.001$).*

## Table 5. Outcome Mix for Non-Detained Case Appeals Decided in 2024 and 2025, Regardless of Filing Year

| Outcome Category | 2024 Count | 2024 Share | 2025 Count | 2025 Share | Change (pp) |
|---|---|---|---|---|---|
| Procedural Dismissal | 3,466 | 15.1% | 4,447 | **23.4%** | **+8.3** |
| Substantive Adverse | 14,675 | 64.0% | 10,485 | 55.2% | -8.8 |
| Admin / Withdrawal | 433 | 1.9% | 738 | 3.9% | +2.0 |
| Remand | 2,708 | 11.8% | 2,722 | 14.3% | +2.5 |
| Favorable Merits | 22 | 0.1% | 19 | 0.1% | +0.0 |
| Favorable Non-Merits | 1,626 | 7.1% | 588 | 3.1% | -4.0 |

Key point: Across all non-detained case appeals decided in 2024 and 2025, regardless of filing year, procedural dismissals increased from 15.1% to 23.4% (up 8.3 points; 95% CI, 7.5 to 9.1; Holm-adjusted p < 0.001), substantive adverse outcomes fell from 64.0% to 55.2%, and remands rose from 11.8% to 14.3%.

*Note: The overall 2024-2025 outcome distribution differs significantly (Pearson's chi-squared test, p < 0.001). Changes in most categories are also statistically significant (two-sample proportion tests; Holm-adjusted p < 0.001). The increase in remands in the full 2025 decision-year docket appears to be substantially influenced by filer mix. Separate analysis shows that DHS-filed appeals in 2025 were far more remand-heavy than noncitizen-filed appeals. Exh. D (Remand Patterns by Filer Type).*

## Table 6. Decision-Code Comparison for All Non-Detained Case Appeals Decided in 2024 vs. 2025, Regardless of Filing Year

| BIA Decision Code | Description | 2024 Count | 2024 Share | 2025 Count | 2025 Share | Change (pp) |
|---|---|---|---|---|---|---|
| DIS | Dismiss appeal / affirm IJ decision | 12,924 | **56.4%** | 9,281 | **48.8%** | **-7.6** |
| SDG | Summary dismissal - untimely or waived | 819 | **3.6%** | 1,662 | **8.7%** | **+5.1** |
| SUD | Summarily dismissed | 1,326 | **5.8%** | 1,750 | **9.2%** | **+3.4** |
| SED | Summary dismissal - no brief filed | 1,262 | 5.5% | 949 | 5.0% | -0.5 |
| SAF | Summary affirmance | 1,291 | 5.6% | 882 | 4.6% | -1.0 |
| WDL | Withdrawal of appeal | 433 | 1.9% | 738 | 3.9% | +2.0 |
| WPD | Withdrawal due to voluntary departure | 39 | 0.2% | 29 | 0.2% | +0.0 |
| REM | Remand | 2,415 | 10.5% | 2,540 | 13.4% | +2.9 |
| ACR | Returned to court to correct deficiency | 293 | 1.3% | 168 | 0.9% | -0.4 |
| NJU | Lacks jurisdiction | 59 | 0.3% | 86 | 0.5% | +0.2 |

Key point: The full decision-year shift was driven primarily by increased use of summary/procedural dismissal codes, especially SDG and SUD, rather than by an increase in DIS-coded decisions.

*Note: Shares are calculated out of all non-detained case appeals decided in the indicated year, not only the displayed codes. The displayed codes account for 20,861 of 22,930 decisions in 2024 and 18,085 of 18,999 decisions in 2025. The DIS code may include both full merits decisions and streamlined affirmances; the data do not allow a further distinction within that category.*

## Table 7. Procedural vs. Substantive Adverse Outcomes by Filing Cohort Among Non-Detained Case Appeals Decided in 2025

| Filing Year | Substantive Adverse | Procedural Dismissal | % Procedural |
|---|---|---|---|
| 2019 | 625 | 31 | 4.7% |
| 2020 | 2,564 | 298 | 10.4% |
| 2021 | 1,236 | 93 | 7.0% |
| 2022 | 1,239 | 157 | 11.2% |
| 2023 | 494 | 98 | 16.6% |
| **2024** | 1,795 | 1,000 | **35.8%** |
| **2025** | 2,517 | 2,767 | **52.4%** |

Key point: Among adverse non-detained case appeals decided in 2025, 35.8% of adverse 2024-filing decisions and 52.4% of adverse 2025-filing decisions were procedural rather than substantive. This pattern is consistent with more procedural resolution in newer cohorts, though older cohorts consist only of cases that remained unresolved into 2025 and may have had a different procedural/substantive mix in earlier decision years.

*Note: The denominator for % Procedural is Procedural Dismissal plus Substantive Adverse among non-detained case appeals decided in 2025 for the indicated filing cohort. Rows for pre-2019 filing years are omitted as de minimis.*

# III. Timing and Outcome Selection

## Table 8. Median Processing Time by Outcome Category for Non-Detained Case Appeals Decided in 2025

| Outcome Category | Count | Median Processing Time (Days) | Mean Processing Time (Days) | 25th Percentile | 75th Percentile |
|---|---|---|---|---|---|
| Procedural Dismissal | 4,447 | 182.0 | 373.0 | 113.0 | 300.5 |
| Substantive Adverse | 10,485 | 1009.0 | 994.1 | 172.0 | 1782.0 |
| Admin / Withdrawal | 738 | 209.0 | 408.2 | 91.0 | 639.0 |
| Remand | 2,722 | 791.0 | 904.1 | 507.2 | 1193.2 |
| Favorable Merits | 19 | 1235.0 | 1540.8 | 1065.5 | 2105.5 |
| Favorable Non-Merits | 588 | 1163.5 | 1181.9 | 883.2 | 1549.0 |

Key point: Timing was strongly outcome-linked in 2025: procedural dismissals had a median processing time of 182 days, compared with 791 days for remands, 1,009 days for substantive adverse outcomes, 1,235 days for favorable merits outcomes, and 1,163.5 days for favorable non-merits outcomes.

*Note: This table uses all non-detained case appeals decided in 2025, regardless of filing year. It therefore captures both recently filed appeals and long-running appeals resolved in 2025.*

## Table 9. Outcome Mix by Processing-Time Bucket for Non-Detained Case Appeals Decided in 2025

| Processing-Time Bucket | Procedural Dismissal | Substantive Adverse | Admin / Withdrawal | Remand | Favorable Merits | Favorable Non-Merits | n |
|---|---|---|---|---|---|---|---|
| < 90 days | 75.3% | 1.4% | 18.6% | 3.5% | 0.0% | 1.1% | 960 |
| 90 - 180 days | 31.7% | 61.6% | 3.3% | 3.2% | 0.0% | 0.2% | 4,686 |
| 181 - 364 days | 45.6% | 41.3% | 4.6% | 7.9% | 0.0% | 0.6% | 3,097 |
| 1 - 2 years | 11.3% | 22.2% | 8.0% | 54.5% | 0.0% | 4.0% | 1,458 |
| 2 - 4 years | 7.5% | 55.6% | 3.0% | 25.6% | 0.3% | 8.1% | 3,885 |
| 4+ years | 7.5% | 77.8% | 0.7% | 10.2% | 0.2% | 3.6% | 4,913 |

Key point: The very fastest 2025 decisions were overwhelmingly procedural or administrative, remands concentrated in the 1-2 year bucket, and substantive adverse outcomes predominated among the 2-4 year and 4+ year buckets.

*Note: Percentages are row percentages and may not total 100.0% in every row because of rounding. The bucket counts sum to 18,999 cases with assignable processing-time buckets.*

# Exhibit D. BIA Non-Detained Case Appeals: Remand Patterns by Filer Type

These exhibit tables summarize remand patterns in non-detained BIA case appeals by filer type. Table 1 compares 2024 and 2025 decision-year remand rates for noncitizen-filed and DHS-filed appeals, including percentage-point change. Table 2 provides supplementary outcome-mix context by filer type for decisions issued in 2024 and 2025. Table 3 shows the filing-year composition of appeals decided in 2024 and 2025, by filer type. Table 4 provides a longer-run descriptive context for decision years 2019 through 2025, with a caution that the DHS series is more volatile because DHS-filed appeals represent a smaller and more compositionally variable share of the docket.

## I. Remand Patterns by Filer Type, 2024 vs. 2025

### Table 1. Remand Rate by Filer Type for Non-Detained Case Appeals Decided in 2024 and 2025

| Filer Type | 2024 Total Decisions | 2024 Remand Count | 2024 Remand Rate | 2025 Total Decisions | 2025 Remand Count | 2025 Remand Rate | Change (pp) |
|---|---|---|---|---|---|---|---|
| Noncitizen | 22,284 | 2,359 | 10.6% | 16,965 | 1,051 | 6.2% | -4.4 |
| Government (DHS) | 630 | 337 | 53.5% | 2,016 | 1,658 | 82.2% | +28.7 |
| Both | 12 | 10 | 83.3% | 15 | 11 | 73.3% | -10 |

Key point: Remand patterns differed sharply by who filed the appeal. Among noncitizen-filed non-detained case appeals, the remand rate fell by 4.4 percentage points (95% CI, -4.9 to -3.8; $p < 0.001$), from 10.6% in 2024 to 6.2% in 2025. Among DHS-filed appeals, by contrast, the remand rate rose by 28.7 points (95% CI, 24.5 to 33; $p < 0.001$), from 53.5% to 82.2%.

*Note: This table uses a decision-year sample of non-detained case appeals decided in 2024 and 2025, without imposing a lower bound on appeal filing date. The denominator for the remand rate is the total number of appeals decided in the indicated year for the specified filer type. The "Other" filer category is omitted because it was de minimis, comprising only 7 decided appeals across 2024 and 2025 combined. Two-sample tests of proportions indicate that the 2024-to-2025 changes in remand rates within noncitizen-filed and DHS-filed appeals were statistically significant ($p < 0.001$). A case-level logistic regression further indicates that the year-over-year change in remand rates differed significantly between noncitizen-filed and DHS-filed appeals (interaction $p < 0.001$). As a robustness check, limiting the analysis to standard REM-code remands only produced the same directional pattern; ACR and BCR comprised only small shares of remands in these years.*

## II. Supplementary Outcome-Mix Context, 2024 and 2025

### Table 2. Outcome Mix by Filer Type for Non-Detained Case Appeals Decided in 2024 and 2025

| Decision Year | Filer Type | Procedural Dismissal | Substantive Adverse | Admin / Withdrawal | Remand | Favorable Merits | Favorable Non-Merits |
|---|---|---|---|---|---|---|---|
| 2024 | Noncitizen | 15.4% | 65.7% | 1.3% | 10.6% | 0.0% | 7.0% |
| 2024 | Government (DHS) | 5.6% | 4.0% | 24.1% | 53.5% | 3.3% | 9.5% |
| 2025 | Noncitizen | 26.0% | 61.3% | 3.3% | 6.2% | 0.0% | 3.2% |
| 2025 | Government (DHS) | 1.8% | 3.8% | 8.7% | 82.2% | 0.8% | 2.6% |

Key point: The overall outcome mix differed sharply by filer type. In both years, noncitizen-filed appeals were dominated by substantive adverse and procedural dismissal outcomes, while DHS-filed appeals were much more remand-heavy—especially in 2025, when 82.2% of DHS-filed appeals resulted in remand.

*Note: Percentages are row percentages within filer type and decision year: the denominator for each percentage is the total number of non-detained case appeals decided in that year for the specified filer type. Each percentage therefore represents the share of those decided appeals falling into the indicated outcome category. Shares may not total exactly 100.0% because of rounding. Favorable merits outcomes among noncitizen-filed appeals rounded to 0.0% in both 2024 and 2025. The "Both" and "Other" filer categories are omitted from this table because they were de minimis in both years and would yield percentages based on very small denominators.*

## III. Filing-Year Composition of 2024 and 2025 Decisions, by Filer Type

### Table 3. Filing-Year Composition of Non-Detained Case Appeals Decided in 2024 and 2025, by Filer Type

| Decision Year | Filer Type | 2019 Filed Share | 2020 Filed Share | 2021 Filed Share | 2022 Filed Share | 2023 Filed Share | 2024 Filed Share | 2025 Filed Share |
|---|---|---|---|---|---|---|---|---|
| 2024 | Noncitizen | 21.4% | 7.6% | 7.5% | 18.4% | 23.6% | 21.4% | - |
| 2024 | Government (DHS) | 11.7% | 4.9% | 11.4% | 16.8% | 37.1% | 17.6% | - |
| 2025 | Noncitizen | 4.6% | 19.3% | 9.1% | 10.6% | 4.9% | 18.1% | 33.2% |
| 2025 | Government (DHS) | 0.8% | 1.5% | 5.5% | 9.1% | 42.6% | 32.0% | 8.3% |

Key point: The 2025 DHS remand-heavy pattern was driven primarily by appeals filed in 2023 and 2024 rather than by same-year 2025 filings. By contrast, noncitizen-filed appeals decided in 2025 were more broadly distributed across filing cohorts and included a much larger same-year 2025 share.

*Note: Percentages are row percentages within filer type and decision year. This table is descriptive and uses the same decision-year sample as Table 1. The filing-cohort mix shown here is consistent with the remand-heavy DHS pattern observed in 2025. The "Both" and "Other" filer categories are omitted from this table because they were de minimis in both years.*

## IV. Longer-Run Decision-Year Context

**Table 4. Remand Rate by Filer Type for Non-Detained Case Appeals Decided in 2019–2025**

| Decision Year | Noncitizen Remand Rate | Government (DHS) Remand Rate |
|---|---|---|
| 2019 | 8.2% | 83.9% |
| 2020 | 6.5% | 97.6% |
| 2021 | 14.5% | 70.2% |
| 2022 | 22.1% | 38.7% |
| 2023 | 12.6% | 57.0% |
| 2024 | 10.6% | 53.5% |
| 2025 | 6.2% | 82.2% |

Key point: The longer-run decision-year series shows a general decline in remand rates for noncitizen-filed appeals after 2022, while DHS-filed appeals remained consistently much more remand-heavy, with larger year-to-year swings in annual remand rates.

*Note: This table is descriptive context only. Detailed 2024 and 2025 counts appear in Table 1. Annual DHS remand rates should be interpreted cautiously because DHS-filed appeals represent a smaller and more compositionally variable share of the docket than noncitizen-filed appeals, which can produce larger year-to-year swings in DHS remand percentages. DHS-filed appeals were also substantially more remand-heavy than noncitizen-filed appeals in both 2024 and 2025, as shown in Tables 1 and 2. "Both" and "Other" filer categories are omitted because annual counts were de minimis across 2019–2025. The longer-run series is based on decision year rather than filing cohort and may therefore reflect cohort-specific clearance patterns. For example, the 2020 DHS spike appears to coincide with an unusually large cohort of DHS-filed appeals decided that year.*

# Exhibit E. Outcome Category Mapping for Non-Detained BIA Case Appeals

This appendix summarizes the code-to-category mapping used for the outcome analysis. "Favorable Non-Merits" captures dispositions that are non-adverse in practical effect but are not merits grants. Remand is treated as a separate category because it returns the case for further proceedings and does not map cleanly onto a simple favorable/unfavorable framework.

| Outcome Category | Included BIA Decision Codes |
|---|---|
| **Procedural Dismissal** | **SUD** — Summarily Dismissed<br>**SED** — Summary Dismissal—No Brief Filed<br>**SDG** — Summary Dismissal—Untimely or Waived Appeal<br>**NJU** — Lacks Jurisdiction<br>**DUT** — Dismiss as Untimely<br>**REJ** — Rejection |
| **Admin / Withdrawal** | **WDL** — Withdrawal of Appeal<br>**CON** — Continued<br>**OTH** — Other |
| **Substantive Adverse** | **DIS**[1] — Dismiss Appeal / Affirm IJ's Decision<br>**SAF** — Summary Affirmance<br>**SAV** — Summary Affirmance / Voluntary Departure<br>**DVD** — Dismissed (Voluntary Departure Granted)<br>**BVD** — BIA Grants Voluntary Departure<br>**D30** — Dismissed (Grant Voluntary Departure, 30 Days)<br>**CFD** — Final Denial of EOIR 42B/40<br>**CFV** — Final Denial of EOIR 42B/40 with Voluntary Departure |
| **Remand** | **REM** — Remand<br>**BCR** — Background Check Remand<br>**ACR** — ROP Returned to Court to Correct Deficiency |
| **Favorable Merits** | **GNR** — Grant with No Remand<br>**GRN** — Granted<br>**CFG** — Final Grant of EOIR 42B/40<br>**CGR** — Conditional Grant of Relief<br>**SUS** — Sustain |
| **Favorable Non-Merits** | **TPS** — Temporary Protected Status<br>**TER**[2] — Termination<br>**TPD** — Terminate — DHS Prosecutorial Discretion<br>**ADM** — Administratively Closed<br>**APD** — Administratively Closed—DHS Prosecutorial Discretion<br>**CTM** — Administratively Closed Other Than ABC<br>**WPD** — Withdrawal—DHS Prosecutorial Discretion |

*Note:* Residual codes not assigned to these analytic categories, if any, were treated as Other / Unmapped and were not material to the declaration tables.

[1] The DIS code may include both full merits decisions and streamlined affirmances; the data do not allow a further distinction within that category.

[2] Termination dispositions are not always favorable to the noncitizen. Some may occur at the government's request to move the case into expedited removal, reinstate a prior removal order, or pursue another procedural path. The data do not permit finer distinctions among termination dispositions.

# EXHIBIT D

## Declaration of Benjamin R. Winograd

1. My name is Benjamin R. Winograd. I am an attorney licensed in California. I have practiced exclusively immigration law since my admission to the bar in 2011. I presently work for the Immigrant & Refugee Appellate Center, LLC, which is located across the street from the Board of Immigration Appeals (BIA). I specialize in representing noncitizens whose cases are on appeal before the BIA or a petition for review before a federal circuit court. I also maintain an index of unpublished BIA decisions that presently contains summaries of more than 8,000 decisions.

2. In the course of my practice, I have observed that the BIA processes cases involving noncitizens who are detained much more quickly than it processes cases involving noncitizens who are not detained. For example, after a notice of appeal is filed, it generally takes weeks for the Board to create a transcript and issue a briefing schedule if the noncitizen is detained, versus years if the noncitizen is not detained. Similarly, once the briefs have been submitted, it generally takes months for the Board to issue a decision if the noncitizen is detained, versus years if the noncitizen is not detained.

3. I have received three decisions from the BIA involving a detained noncitizen since the start of 2025, and each time less than six months had elapsed since the filing of the notice of appeal. In the first case, the notice of appeal was filed on September 2, 2024; the briefing schedule was issued on October 10, 2024; briefing was complete by November 20, 2024; and the BIA issued its decision on January 17, 2025. In the second case, the notice of appeal was filed on December 2, 2024; the briefing schedule was issued on December 18, 2024; briefing was complete by January 8, 2025; and a decision was issued on April 28, 2025. In the third case, the notice of appeal was filed on October 1, 2025; the BIA issued a briefing schedule on November 19, 2025; briefing was complete by December 10, 2025; and the BIA issued its decision on March 20, 2026.

4. By comparison, processing times in cases involving non-detained noncitizens are much lengthier. At present, I have five such cases in which I am awaiting the issuance of a transcript and briefing schedule. In those cases, the notices of appeal were submitted on December 18, 2023; October 16, 2024; December 2, 2024; December 16, 2024; and February 7, 2025. Meanwhile, I have 14 pending cases involving non-detained noncitizens in which briefing is complete and I am awaiting a decision. In those cases, briefing was complete on March 23, 2021; October 12, 2021; November 3, 2021 (two cases); November 24, 2021; January 27, 2022; March 28, 2022; April 27, 2022; August 8, 2023; February 23, 2024; July 8, 2024; May 7, 2025; June 18, 2025; and December 30, 2025.

5. The attorneys representing Mahmoud Khalil have informed me that the BIA issued the transcript and original briefing schedule only 13 days after receiving the notice of appeal, and that it issued a decision only nine days after briefing was complete. I am not aware of any case—even one involving a detained noncitizen—in which the BIA issued a transcript or decision so quickly. Given that Mr. Khalil was not detained while his appeal was pending, the only possible conclusion is that the BIA specifically placed his case on an accelerated timeline, presumably with the aim of upholding the order of removal as quickly as possible.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2026

Benjamin Winograd