# DECLARATION OF DANA LEIGH MARKS

I, DANA LEIGH MARKS, hereby declare and state:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I would testify thereto. I am over eighteen years of age and of sound mind to declare the facts stated herein.

2. I am providing this declaration in my personal capacity. The opinions expressed should not be construed to represent the positions or opinions of any individual, governmental or organizational entity with whom I am currently or previously have been affiliated.

3. I served for 35 years as an immigration judge in San Francisco, California. In that capacity, I rendered oral and written decisions in more than 24,000 cases, in non-detained and detained removal, deportation, exclusion and bond proceedings, from January 1987 until I retired on December 31, 2021. A few of these cases involved classified evidence requiring my security clearance to be upgraded to Secret and several involved material support of terrorist issues as well as issues involving allegations of persecution of others.

4. During my tenure as an immigration judge I was an active member of the National Association of Immigration Judges (NAIJ), a nationwide professional association of immigration judges. Between 1999 to 2017 I was elected to two two-year terms as Vice President and seven two-year terms as President. In those capacities, I spearheaded public outreach, education, and media/ lobbying campaigns, including authorship of scholarly professional articles and press opinion pieces. I testified before Congress on multiple occasions, as well as conducted dozens of television, radio, and press interviews to educate the public regarding immigration law and the immigration court system. I directed internal union business, organizing, and public outreach. I

served as lead negotiator to obtain the first collective bargaining agreement, represented the union in grievances and informal meetings. I am currently a President Emerita of NAIJ.

5. Before becoming an immigration judge, I was in the private practice of immigration law from 1977 until December 1986. While in private practice I was lead counsel for the non-citizen in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), a landmark case before the U.S. Supreme Court which accepted our interpretation of the well-founded fear standard implemented by the Refugee Act of 1980 and remains the governing law today. I also represented the prevailing party in three other reported decisions: *Internt'l Union of Bricklayers and Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985), *Shamsian v. Ilchert,* 534 F.Supp 178 (N.D. Cal 1982, and *Matter of Bonnette*, 17 I&N Dec. 584 (1980).

6. I am currently an inactive member of the California State bar having been admitted in 1977 and in active status until this year. During my career prior to taking the bench, I was admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and the United States District Court for the Northern District of California.

7. This declaration supplements my prior declarations submitted in Mr. Khalil's case, which attest to the highly unusual nature of several of the Immigration Judge's (IJ) decisions. *See* Exhibit A, Declaration of Dana Leigh Marks, dated July 9, 2025; Exhibit B, Declaration of Dana Leigh Marks, dated July 28, 2025; Exhibit C, Declaration of Dana Leigh Marks, dated August 9, 2025.

8. As set forth in my prior declarations, I have reviewed portions of the underlying record of Mr. Khalil's removal proceedings. I have also reviewed the Board of Immigration Appeals (BIA) decision in his case, issued April 9, 2026, and subsequently published April 15, 2026 and the oral and written decisions of the IJ dated April 11, 2025, June 20, 2025, and September 12, 2025. I

have also reviewed recent reporting from the *New York Times*, dated May 8, 2026, discussing the recusal of at least three members of the BIA from the publication decision in Mr. Khalil's case, as well as several unusual procedural developments in the handling of his case. I understand from this reporting that internal BIA documents show that the case was considered high priority by the BIA even before it officially received Mr. Khalil's appeal, and that staff were instructed that his case was to be handled as if he were still in detention, which would cause the adjudication of his appeal to be done more quickly, even though he had been released months prior to the IJ's September 12 removal order. I also understand that the BIA issued its decision within nine days of the conclusion of briefing.

9. I am writing this declaration to explain the IJ's duty of impartiality and how it operates in practice within EOIR, including under what circumstances an agency employee would be likely to recuse from a case. Specific to Mr. Khalil's case, I am writing to explain the aspects of his removal proceedings that I believe are unusual and which support the conclusion that the IJ in his case may have violated her duty to decide his case independently and impartially. I am also writing to explain the typical timeline and procedure for appeals before the BIA, based on my experience of being an IJ for 35 years.

10. Several aspects of the progression of Mr. Khalil's underlying removal proceedings are extremely unusual in my experience and raise the specter of a lack of impartiality or prejudgment by the immigration judge and the BIA. For one, it is highly unusual that the IJ scheduled a contested removability hearing to be held only three days after the first substantive hearing, in this case, on April 8, 2025 setting the hearing for April 11, 2025. In a case like this, with a rarely-used immigration statute, it would be typical for an IJ to engage in extensive legal research before conducting a hearing and issuing a decision. Similarly, the IJ's issuance of a

removability decision on April 11 during the hearing, rather than reserving decision to thoroughly examine the facts presented at the hearing and craft a detailed written decision, is also highly unusual, particularly in such a complicated case. The speed with which these hearings were held is highly suspect and lead me to conclude that the outcome was predetermined without full consideration of the testimony and documentary evidence presented.

11. Additionally, the September 12 decision wherein the IJ declined to follow existing Board precedent—precedent which had held that noncitizens similarly situated to Mr. Khalil (i.e. whose alleged misrepresentation occurred at the time of adjustment of status) were eligible for a waiver of removability—is also extremely unusual. In fact, in all my years on the bench I have never seen that done. In fact, it would seem to be clear error as the regulations require IJs to follow Board precedent. It is highly abnormal in my experience for an IJ to issue a decision declining to follow Board precedent as it would normally be found to constitute clear error on the IJ's part. *See* 8 C.F.R. § 1003.1(g).

12. The duty to decide cases independently and impartially is one of if not the most fundamental duties of an IJ. *See* 8 C.F.R. § 1003.10(b). It is an acknowledged cornerstone of due process. IJs are also instructed to follow three ethical codes— their state bar code of ethics, the DOJ code of ethics, and the ABA model code of ethics. It is heavily emphasized during training of an IJ that they are obligated to decide cases independently and without external influence. It is also emphasized that it is important to avoid even the appearance of bias or a lack of impartiality when acting as an IJ. The recusal of immigration judges and BIA members generally occur for only two reasons: a close personal relationship to the respondent, such as the respondent being an immediate family member, or prior involvement in the case itself. It is also highly unusual for the reason for any recusal to not be disclosed to the parties, as the parties can waive some

grounds of potential recusal. EOIR training and the input I received from my direct supervisors have always made it extremely clear that recusals are highly disfavored and should be granted sparingly. In my experience, recusals were generally extremely rare, and a significant conflict would have to be present to justify recusal. *See also Matter of Exame*, 18 I&N Dec. 303, 305 (BIA 1982) (setting out standard for recusal). For example, when I first became an IJ, agency leadership instructed me that I could adjudicate cases in which my former employer, a private firm, was involved as long as I no longer had a financial stake in the firm and I had not been personally involved in the case before me. Frankly, this fact surprised me, as there was not even a cooling off period since my law partners paid out my share almost immediately. This was also surprising enough that I felt it necessary to comply with ethical guidelines regarding both the appearance of impropriety as well as actual fact of impropriety that, for months after becoming an IJ, I would advise the government attorneys of my prior relationship with the firm and ask if they had any objections to my continuing on the case.

13. In my experience, general legal discussions—such as a discussion about general legal principles or novel legal questions in the abstract—would not be a basis for recusal. Having a personal relationship with the IJ would also not be a basis for recusal.

14. It is hard to imagine that recusal here was required due to prior official, sanctioned involvement with the cases (i.e. the BIA member previously participating in the case as the prosecuting DHS attorney), in part because it would be highly irregular to have any member of the BIA or their staff to be involved in cases at the immigration court level. Further, a review of the current BIA membership demonstrates that only one member was at the Office of Immigration Litigation during the pendency of Mr. Khalil's removal proceedings. The fact that three BIA members recused from Mr. Khalil's case, as reported by *The New York Times*, raises

the issue of *ex parte* communications between those members and the IJ during the removal proceedings, which in turn gives rise to the question of whether ethical rules are being observed properly, and whether the regulation which requires IJ's to make decisions in their cases by themselves, 8 C.F.R. § 1003.10(b), was adhered to in this case.

15. Based on the above, I do not believe there is a legitimate reason that at least *three* current members of the BIA would have recused from Mr. Khalil's case. I have never heard of such a high number of recusals in one single case. This strongly suggests to me that multiple members of those currently sitting on the BIA were significantly involved in the IJ's underlying decisions.

16. As the appearance of impropriety is as violative of ethical rules as an actual improper action, I firmly believe that the BIA's decision should be vacated and the case remanded to a different immigration judge. The findings of the judge and the Board should be disregarded and the matter considered completely *de novo* by a different IJ to cure this defect.

17. Additionally, based on my experience, it is unprecedented for the BIA to issue a decision within nine days of briefing concluding. I have never in my entire 35-year career seen a case—detained or non-detained—in which a decision was issued so quickly. The amount of time a case remains pending at the BIA depends on the length of the hearing transcript and the volume of materials in evidence, which must be reviewed and summarized. In my experience, a complicated case such as this one with rare legal issues would generally take an average of two to four years for a decision to be issued. Even if the case were treated as a routine detained case, the quick time frame here would still be aberrant as detained cases often take up to 18 months for a decision. I have been privy to recent data (January 1, 2024 to February 27, 2026) analyzed by University of Berkeley Law researchers which indicated that the average processing time for non-detained cases before the BIA was 795 days. The apparent fact that the agency instructed

staff to mark Mr. Khalil's case as detained when he was out of custody is highly unusual. In my experience, EOIR is meticulous about ensuring that cases are properly marked as detained or non-detained. Although the task was a clerical one, judges were also trained to assure that a case was properly categorized as detained or non-detained. Importantly, whether a respondent was detained at one point during removal proceedings has no bearing on if their appeal is processed as detained or non-detained. Supervisors made it known to immigration judges that if a non-citizen's detention status was changed, they were to treat the case under the current status regardless of the past history of the matter.

18. It is particularly shocking to me that the decision was issued so quickly in Mr. Khalil's case because, from reviewing the record of proceedings, this is an unusually complicated case, and one that is far more complex than the typical removal case that the BIA reviews on appeal. In my experience, a straightforward asylum case with simple facts and a well-established protected ground (like religion or ethnicity) would pend at the BIA an average of two to three years. The complexity of the legal issue, length of hearing transcript and a voluminous documentary record would generally indicate that a case would remain pending for the maximum average time. Given the complexity of this case and extensiveness of the record, I would expect that a decision would take significant legal research and internal review. The speed in which the decision was issued leads me to conclude that the BIA had predetermined the decision in Mr. Khalil's case.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: May 13, 2026

/s/ Dana Leigh Marks

Dana Leigh Marks

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Mahmoud KHALIL,<br><br>*Petitioner*,<br>v.<br><br>Donald J. TRUMP, *et al.*,<br><br>*Respondents*. | No. 25 Civ. 1963 |

DECLARATION OF DANA LEIGH MARKS

I, DANA LEIGH MARKS, hereby declare and state:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I would testify thereto. I am over eighteen years of age and of sound mind to declare the facts stated herein.

2. I am providing this declaration in my personal capacity. The opinions expressed should not be construed to represent the positions or opinions of any individual, governmental or organizational entity with whom I am currently or previously have been affiliated.

3. I served for 35 years as an immigration judge in San Francisco, California. In that capacity, I rendered oral and written decisions more than 24,000 cases, in non-detained and detained removal, deportation, exclusion and bond proceedings, from January 1987 until I retired on December 31, 2021. A few of these cases involved classified evidence requiring my security clearance to be upgraded to Secret and several involved material support of terrorist issues as well as issues involving allegations of persecution of others.

4. During my tenure as an immigration judge I was an active member of the National Association of Immigration Judges (NAIJ), a nationwide professional association of

immigration judges. Between 1999 to 2017 I was elected to two two-year terms as Vice President and seven two-year terms as President. In those capacities, spearheaded public outreach, education, and media/ lobbying campaigns, including authorship of scholarly professional articles and press opinion pieces. I testified before Congress on multiple occasions, as well as conducting dozens of television, radio, and press interviews to educate the public regarding immigration law and the immigration court system. I directed internal union business, organizing, and public outreach. I served as lead negotiator to obtain first collective bargaining agreement, represented union in grievances and informal meetings. I am currently President Emerita of NAIJ,

5. From 1987 to 1997, I also was an adjunct faculty member at accredited law schools teaching immigration law survey courses. Throughout my career I have taught dozens of continuing education and training classes to attorneys, including many to state court judges involving the intersection of immigration law with state law provisions.

6. Before becoming an immigration judge, I was in the private practice of immigration law from 1977 until December 1986. While in private practice I was lead counsel for the non-citizen in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), a landmark case before the U.S. Supreme Court which accepted our interpretation of the well-found fear standard implemented by the Refugee Act of 1980 and remains the governing law today. I also represented the prevailing party in three other reported decisions: *Internt'l Union of Bricklayers and Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985), *Shamsian v. Ilchert,* 534 F.Supp 178 (N.D. Cal 1982, and *Matter of Bonnette*, 17 I&N Dec. 584 (1980).

6. I am currently an inactive member of the California State bar having been admitted in 1977 and in active status until this year. During my career prior to taking the bench, I

was admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and the United States District Court for the Northern District of California.

7. I have carefully reviewed pertinent materials regarding Mr. Khalil's cases, including the Order and Opinion of this Court issued June 11, 2025, the Decision and Order of the Immigration Judge dated June 20, 2025, ECF 333, and the Declaration of Johnny Sinodis, ECF 284-3. In my expert professional opinion, the decision of the Immigration Judge finding him removable based on factual allegations 6 and 8 of the Additional Charges of Inadmissibility/Deportability and the charge of removability under Immigration and Nationality Act ("INA") § 237(a)(1)(A) asserting inadmissibility under INA § 212(a)(6)(C)(i) is not at all supported by the evidence and caselaw and should be reversed based on the facts as I understand them and the law when reviewed on appeal.

8. It is blackletter immigration law that a misrepresentation must be material to provide a basis for inadmissibility and, thus, here removability. Dozens of cases in various tribunals ranging from the Board of Immigration Appeals, District Courts, Circuit Courts of Appeal and the Supreme Court discuss materiality in this context. The consensus is clear: to be a material fact it is required that knowledge of the alleged true facts if disclosed would have led to a disqualifying fact actually existing. If an item not disclosed would prompt further investigation, it is material only if that investigation would have reasonably, predictably or naturally tended to lead to the discovery of some legal disqualification. The grounds of inadmissibility most commonly raised in the context of asserted inadmissibility for allegedly false statements on prior applications involve criminality, terrorism, Nazism, totalitarianism, foreign military service or involvement in the persecution of others. Based on my review of the

pertinent documents I was provided as specified above, none of those grounds appear to be relevant to Mr. Khalil's case. In fact, in my opinion, the record here is devoid of even a scintilla of evidence that would give rise to a fair inference that knowledge of the information contained in these allegations, even if construed as being factually accurate as to the alleged omission or misstatement, would have led to disqualifying evidence on any grounds.

9. Based on the evidence in the record and the publicly known facts regarding DHS's efforts to remove Mr. Khalil, these factual allegations and charges appear so baseless as to appear to be pretextual efforts to chill his First Amendment rights of speech and association rather than to provide a reasonable basis to assert an actionable misrepresentation.

10. The failure of DHS to provide any rebuttal evidence or even a closing argument on the charge and allegations discussed here signals to me a tacit acknowledgement that the charge cannot be sustained. The burden is on the DHS to produce clear and convincing evidence but no evidence except the favorable evidence presented by Mr. Khalil has been presented to address the issue of materiality (or even of willfulness which is also part of requirement to sustain the charge here; nothing in the record I have reviewed would merit sustaining the element of willfulness either).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: July 9, 2025

/s/ Dana Leigh Marks

Dana Leigh Marks

# EXHIBIT B

DECLARATION OF DANA LEIGH MARKS

I, DANA LEIGH MARKS, hereby declare and state:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I would testify thereto. I am over eighteen years of age and of sound mind to declare the facts stated herein.

2. I am providing this declaration in my personal capacity. The opinions expressed should not be construed to represent the positions or opinions of any individual, governmental or organizational entity with whom I am currently or previously have been affiliated.

3. I served for 35 years as an immigration judge in San Francisco, California. In that capacity, I rendered oral and written decisions in more than 24,000 cases, in non-detained and detained removal, deportation, exclusion and bond proceedings, from January 1987 until I retired on December 31, 2021. A few of these cases involved classified evidence requiring my security clearance to be upgraded to Secret and several involved material support of terrorist issues as well as issues involving allegations of persecution of others.

4. During my tenure as an immigration judge I was an active member of the National Association of Immigration Judges (NAIJ), a nationwide professional association of immigration judges. Between 1999 to 2017 I was elected to two two-year terms as Vice President and seven two-year terms as President. In those capacities, I spearheaded public outreach, education, and media/ lobbying campaigns, including authorship of scholarly professional articles and press opinion pieces. I testified before Congress on multiple occasions, as well as conducted dozens of television, radio, and press interviews to educate the public regarding immigration law and the immigration court system. I directed internal union business, organizing, and public outreach. I served as lead negotiator to obtain first collective bargaining

agreement, represented union in grievances and informal meetings. I am currently President Emerita of NAIJ.

5. From 1987 to 1997, I also was an adjunct faculty member at accredited law schools teaching immigration law survey courses. Throughout my career I have taught dozens of continuing education and training classes to attorneys, including many to state court judges involving the intersection of immigration law with state law provisions.

6. Before becoming an immigration judge, I was in the private practice of immigration law from 1977 until December 1986. While in private practice I was lead counsel for the non-citizen in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), a landmark case before the U.S. Supreme Court which accepted our interpretation of the well-found fear standard implemented by the Refugee Act of 1980 and remains the governing law today. I also represented the prevailing party in three other reported decisions: *Internt'l Union of Bricklayers and Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985), *Shamsian v. Ilchert,* 534 F.Supp 178 (N.D. Cal 1982), and *Matter of Bonnette*, 17 I&N Dec. 584 (1980).

7. I am currently an inactive member of the California State bar having been admitted in 1977 and in active status until this year. During my career prior to taking the bench, I was admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and the United States District Court for the Northern District of California.

8. I am familiar with the facts and circumstances of Mr. Khalil's case and have reviewed the record in immigration court proceedings, including the Decision and Order of the Immigration Judge dated June 20, 2025, the transcript of Immigration Court proceedings held on April 11, 2025, evidence submitted in Mr. Khalil's removal and bond proceedings

demonstrating his equities in the United States, Mr. Khalil's Motion for Change of Venue submitted July 18, 2025 and DHS's Opposition to the Motion for Change of Venue submitted July 28, 2025.

9. In my expert professional opinion based on the materials I reviewed, I believe the facts in this case and the law support transfer of Mr. Khalil's continued removal proceedings to the non-detained docket at the New York Immigration Court, where he resides with his family. I understand that the future removal proceedings in this matter will consist of an evidentiary hearing on Mr. Khalil's request for a waiver under INA § 237(a)(1)(H).

10. Typically, once someone is released from detention, venue for their case is transferred to the non-detained court having jurisdiction over the place where their home address is. For years when I was on the bench, this was the established process, even if some testimony had already been taken. When a respondent is seeking a discretionary form of relief, the availability of witnesses is crucial, and most witnesses for an INA § 237(a)(1)(H) waiver are typically located in a respondent's home region. The critical element of the availability of witnesses outweighs any small inconvenience to DHS, and so such change of venue motions are routinely granted as a matter of course.

11. I understand that DHS has asserted that having Mr. Khalil and his witnesses testify by video would alleviate any harms imposed by keeping the case in Louisiana, far away from where Mr. Khalil resides in New York. Based on my decades of experience, in person testimony is significantly more preferable. When assessing demeanor, body language is extremely important and does not transmit well in a video setting, which focuses more on someone's face rather than their entire body. Nervousness and hesitancy in testimony is much more difficult to assess when using video rather than in-person testimony. In my experience

there were multiple times when the video set-up in the courtroom made it difficult to clearly see the faces of witnesses, If anyone is using a foreign language, the quality of the remote platform is further compromised by the complexity of having to go through an interpreter. Although video testimony can be a useful tool, especially for preliminary matters, short hearings with no disputed issues or for status conferences, it is always far superior to have live in-person testimony for merits hearings where, as here, there is no barrier to doing so before the New York Immigration Court.

12. I understand that DHS has also stated that the fact that the IJ heard testimony on the charges of removability against Mr. Khalil and his application for asylum means she is best positioned to evaluate his INA § 237(a)(1)(H) waiver. That does not comport with my experience. The discretionary waiver under INA § 237(a)(1)(H) is wholly distinct from an asylum application and will require new, different testimony and evidence to be presented. Immigration Judges routinely pick up cases where extensive testimony has already been taken in order to evaluate new applications for relief or to adjudicate a case where the prior judge is unavailable. During my years on the bench, I adjudicated dozens of cases where another judge had begun the proceedings and heard testimony. This was routine practice in several circumstances, such as when a new judge takes over the docket of a retired judge, where venue was changed after some testimony had already been taken because a noncitizen moved or was released from detention, or when a case completed by a former judge is reopened to allow for a hearing on a previously unavailable form or relief. It was established protocol in all those cases to listen to the digital record and carefully review the documentary evidence in order to be fully cognizant of the record created by the previous judge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: July 28, 2025

/s/ *Dana Leigh Marks*

Dana Leigh Marks

# EXHIBIT C

DECLARATION OF DANA LEIGH MARKS

I, DANA LEIGH MARKS, hereby declare and state:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I would testify thereto. I am over eighteen years of age and of sound mind to declare the facts stated herein.

2. I am providing this declaration in my personal capacity. The opinions expressed should not be construed to represent the positions or opinions of any individual, governmental or organizational entity with whom I am currently or previously have been affiliated.

3. I served for 35 years as an immigration judge in San Francisco, California. In that capacity, I rendered oral and written decisions more than 24,000 cases, in non-detained and detained removal, deportation, exclusion and bond proceedings, from January 1987 until I retired on December 31, 2021. A few of these cases involved classified evidence requiring my security clearance to be upgraded to Secret and several involved material support of terrorist issues as well as issues involving allegations of persecution of others.

4. During my tenure as an immigration judge I was an active member of the National Association of Immigration Judges (NAIJ), a nationwide professional association of immigration judges. Between 1999 to 2017 I was elected to two two-year terms as Vice President and seven two-year terms as President. In those capacities, spearheaded public outreach, education, and media/ lobbying campaigns, including authorship of scholarly professional articles and press opinion pieces. I testified before Congress on multiple occasions, as well as conducting dozens of television, radio, and press interviews to educate the public regarding immigration law and the immigration court system. I directed internal union business, organizing, and public outreach. I

served as lead negotiator to obtain first collective bargaining agreement, represented union in grievances and informal meetings. I am currently President Emerita of NAIJ.

5. Before becoming an immigration judge, I was in the private practice of immigration law from 1977 until December 1986. While in private practice I was lead counsel for the non-citizen in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), a landmark case before the U.S. Supreme Court which accepted our interpretation of the well-found fear standard implemented by the Refugee Act of 1980 and remains the governing law today. I also represented the prevailing party in three other reported decisions: *Internt'l Union of Bricklayers and Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985), *Shamsian v. Ilchert,* 534 F.Supp 178 (N.D. Cal 1982, and *Matter of Bonnette*, 17 I&N Dec. 584 (1980).

6. I am currently an inactive member of the California State bar having been admitted in 1977 and in active status until this year. During my career prior to taking the bench, I was admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and the United States District Court for the Northern District of California.

7. I have carefully reviewed pertinent materials regarding Mr. Khalil's cases, including the Decision and Order of the Immigration Judge dated June 20, 2025, evidence submitted in Mr. Khalil's removal and bond proceedings demonstrating his equities in the United States, and evidence to be submitted in support of his application for a waiver under Immigration and Nationality Act ("INA") § 237(a)(1)(H).

8. As I have already stated in federal court (*see Khalil v. Trump*, 2:25-cv-01963-MEF, Dkt. 352-7 (D.N.J. Jul. 17, 2025)), in my expert professional opinion based on the materials I reviewed, the record in this case does not support a finding that Mr. Khalil is removable under Immigration and Nationality Act ("INA") § 237(a)(1)(A) [8 U.S.C. § 1227(a)(1)(A)] due to

inadmissibility under INA § 212(a)(6)(C)(i) [8 U.S.C. § 1182(a)(6)(C)(i)] for fraud or misrepresentation. However, I understand that the Immigration Judge has found to the contrary. Recognizing that the Judge has sustained the charge, the record does support his statutory eligibility for a waiver of that ground of removal under INA § 237(a)(1)(H) [8 U.S.C. § 1227(a)(1)(H)]. Additionally, careful review of the above materials fails to contain any adverse factors that would militate against a discretionary grant of that relief. Mr. Khalil possesses favorable factors which outweigh the single adverse factor.

9. A waiver under INA § 237(a)(1)(H) is available to immigrants who obtained permanent resident status despite the fact that they were inadmissible because of fraud or misrepresentation if they are otherwise admissible. To qualify, the applicant must have a qualifying relative which Mr. Khalil possesses by virtue of his relationship with his United States citizen wife and infant son. Additionally, eligibility for the waiver exists whether or not the disqualifying misrepresentation which gives rise to the need for it was willful or innocent.

10. The § 237(a)(1)(H) waiver is discretionary. Caselaw mandates the traditional balancing of adverse and favorable factors used in countless immigration cases to guide the exercise of that discretion. Favorable factors have been held to include family ties in the U.S., evidence of hardship to the family if deportation occurs, stable employment history, evidence of value and service to the community, residence of long duration and any other evidence demonstrating good moral character. The adverse factors which have been held as relevant include the nature and underlying circumstances of the underlying ground of removability, whether willful or unintentional, the nature, seriousness, and recency of any criminal record, and any evidence of bad moral character. *See Matter of Mendez*, 21 I&N Dec.296 (BIA 1996).

11. Mr. Khalil has demonstrated statutory eligibility for the waiver based on the immigration judge's finding of removability under INA § 237(a)(1)(A) asserting inadmissibility based on fraud or misrepresentation and the fact that he is married to a native born U.S. citizen. He is also the father of an infant U.S. citizen son.

12. Mr. Khalil possesses multiple strong favorable factors, most importantly his U.S. citizen wife and infant son, family members who would suffer direct hardship were he to be removed. He has a stable employment and educational history, rising to the high level of a master's program. He has lived in the U.S. for several years, and took the necessary steps to maintain legal status by obtaining lawful permanent resident status in a timely and conscientious manner. Evidence of his good moral character has been presented in the form of many declarations from fellow students and faculty members supporting him. They attest to his positive contributions to their academic community.

13. Whatever misrepresentation is found to have occurred, it is minimal at most. Mr. Khalil has no history of criminal activity. There is no evidence of any other acts demonstrating bad moral character. The sole adverse factor is the very ground of inadmissibility itself. While that must be considered as an adverse factor, it is minor and does not outweigh the favorable factors in this case. Mr. Khalil's uncontroverted testimony is that any mischaracterization regarding for whom he worked as an intern was an innocent misinterpretation of the question asked on the form. The DHS has not produced any evidence of Mr. Khalil's membership in any group, thus his testimony in uncontroverted on that aspect as well. Moreover, even if taken as established, neither of these innocent "misrepresentations" are material. To the contrary, they are quite trivial. Additionally, no evidence of willfulness been shown, which further diminishes the adverse weight this factor should be accorded.

14. Mr. Khalil clearly merits the favorable exercise of discretion to grant the waiver based on the record I reviewed. Simply put, the favorable factors in his case greatly outweigh the single adverse factor of the nature and circumstances regarding the asserted misrepresentations.

15. I can also attest that the most important consideration when evaluating whether or not favorable discretion should be exercised to grant a § 237(a)(1)(H) waiver are close family ties. In my 35 years on the bench, I cannot recall a single case where I denied a waiver when such equities existed. In my informal legal discussions with colleagues on this point, I learned I was not alone in viewing family ties, particularly to spouses and young children, as the most weighty factor to consider and one which was rarely, if ever, found to be insufficient to warrant a grant of the waiver absent egregious adverse factors.

16. Given the strength of Mr. Khalil's equities and the lack of any negative discretionary, factors, I believe denial of his application for the waiver would be based on what would appear to be retaliation by the government based on his First Amendment protected activity.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: August 9, 2025

/s/ Dana Leigh Marks

Dana Leigh Marks